FILED
United States Court of Appeals
Tenth Circuit

April 2, 2008

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

DONALD LEE GILSON,

       Petitioner-Appellant,

v.

MARTY SIRMONS, Warden, Oklahoma
State Penitentiary,

       Respondent-Appellee.

No. 06-6287

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF OKLAHOMA
(D.C. No. CV-01-1311-C)**

Timothy R. Payne, Assistant Federal Public Defender (James A. Drummond, Federal
Public Defender, and Mariatu Kargbo, Research and Writing Specialist, with him on the
briefs) Death Penalty Federal Habeas Corpus Division, Office of Federal Public
Defender, Oklahoma City, Oklahoma, for Petitioner-Appellant.

Preston Saul Draper, Assistant Attorney General (W. A. Drew Edmondson, Attorney
General of Oklahoma, with him on the brief), Oklahoma City, Oklahoma, for
Respondent-Appellee.

Before **HENRY**, Chief Circuit Judge, **TACHA** and **BRISCOE**, Circuit Judges.

**BRISCOE**, Circuit Judge.

Petitioner Donald Lee Gilson, an Oklahoma state prisoner convicted of first degree

child abuse murder and sentenced to death, appeals the district court's denial of his 28

U.S.C. § 2254 habeas corpus petition. We exercise jurisdiction pursuant to 28 U.S.C. §

1291 and affirm.

## I. BACKGROUND

The pertinent facts of this case were well summarized by the Oklahoma Court of

Criminal Appeals (OCCA) in resolving Gilson's direct appeal:

> On February 9, 1996, the skeletal remains of eight (8) year old Shane Coffman were found in an abandoned freezer located next to a mobile home formerly rented by his mother, Bertha Jean Coffman. A subsequent search of the mobile home revealed a photograph of [Gilson]. On February 11, 1996, authorities from the Cleveland County Sheriff's Office met with [Gilson] at his mobile home. Living in the mobile home with [Gilson] was Bertha Jean Coffman and her four children, twelve (12) year old Isaac, ten (10) year old Tia, eleven (11) year old Tranny and seven (7) year old Crystal. The children were immediately removed from the trailer and taken to Children's Hospital in Oklahoma City. [Gilson] and Bertha Jean Coffman were detained by the deputies.

> Examinations of the children conducted in the emergency room revealed Tranny and Crystal were healthy with a few small scars on each. However, Isaac and Tia were malnourished and emaciated. Tia's feet were swollen and she had difficulty walking. She had gangrenous tissue on her right foot. On her right buttocks was a large open ulcer. Isaac was in the worst condition, emaciated and needing assistance to walk. He was malnourished and had several injuries, in various stages of healing, and scars throughout his body.

> In their initial interview with police, [Gilson] and Coffman both denied any knowledge as to the manner in which Shane died. They stated he had run away from home during the early part of November and they had found him dead in the weeds near Coffman's trailer. They decided that putting him in the freezer would be the best thing to do. However, in subsequent interviews both [Gilson] and Coffman recanted this story and admitted to knowing more about the circumstances surrounding Shane's death. From interviews with [Gilson], Coffman, the Coffman children and other

2

witnesses, the following picture emerged.

The four Coffman children mentioned above, along with the murder victim in this case, and another brother, thirteen (13) year old Jeremy, lived with their mother Bertha Jean Coffman, in a mobile home. During the fall of 1994, the Cleveland County Sheriff's Department received complaints of sexual abuse committed upon one of the Coffman children by Coffman's then boyfriend (not [Gilson]). The investigating detective visited Coffman's mobile home and found the conditions deplorable and unsanitary. The children were removed from Coffman's home until conditions improved. It was about this time that Bertha Jean Coffman met [Gilson]. They were both working as janitors at Little Axe Schools. [Gilson] fixed up Coffman's trailer so she could get her children back. The children were subsequently returned to their mother.

Thereafter, [Gilson] began spending more and more time with Coffman and was given the authority to discipline the children. In June of 1995, the oldest child, Jeremy, ran away [as a result of his mistreatment by Gilson]. The next month, Coffman and her children walked to [Gilson]'s trailer for a visit and never returned to their home. Whatever possessions they had were left at Coffman's trailer. [Gilson]'s trailer had only 2 bedrooms; [Gilson] and Coffman slept in one room and the other room contained [Gilson]'s leather working material. As a result, all five children were forced to sleep on blankets in the living room. They were not permitted to go outside, but had to remain inside the trailer at all times. The children were taken out of school and claimed to be homeschooled by Coffman, although no evidence of homeschooling was ever found. The children were also not permitted to go to church.

[Gilson] and Coffman both disciplined the children. This discipline took several forms, including standing at the wall, sometimes for hours at a time, and beatings with a bamboo stick, a belt, boards, wooden rulers, metal ruler, and a bullwhip. The children were also made to sit in the bathtub, often for hours at a time. Food was withheld, particularly from Isaac and Tia, as punishment. The abuse inflicted upon Shane Coffman resulted in his death on August 17, 1995.

At trial, Tranny testified that he last saw his brother Shane sitting in the bathtub. Tranny said Shane had gotten in trouble for going to the bathroom on the living room carpet. He said that before Shane was put into the bathtub, [Gilson] beat him with a board. Tranny said Shane received

3

several beatings with the board, all over his body. After the beating, [Gilson] put Shane into the bathtub. After a couple of hours, Shane was let out of the bathtub. He then got into trouble again. Tranny said [Gilson] and Coffman then took Shane outside the trailer. Tranny did not know what happened to Shane while he was outside, but he said he could hear Shane screaming. [Gilson] and Coffman carried Shane back inside the trailer. Tranny said Shane's arms were swollen, he was breathing "weird", and he had a soft spot on his head. Pursuant to [Gilson]'s "house rules", the other children were not permitted to talk to Shane. [Gilson] then carried Shane to the bathroom and placed him in the bathtub. Tranny said he and the other children heard a few more screams and banging noises. He said both [Gilson] and Coffman were with Shane when they heard the screams. The children then decided to try and go to sleep. He said they were awakened some time later by [Gilson] and Coffman and told that Shane had run away, and that [Gilson] and Coffman were going to look for him.

Isaac testified [Gilson] first sent Shane to stand at the wall for wetting the bed. While he was standing at the wall, [Gilson] hit him with a board. [Gilson] and Coffman eventually took Shane to the bathroom and put him in the bathtub. Isaac said [Gilson] made all the other children go to the bathroom and tell Shane what a bad boy he was. He said that both [Gilson] and Coffman remained in the bathroom with Shane while the children watched television. He said they could hear Shane crying. Isaac further stated that later that night, [Gilson] and Coffman told them Shane had run away.

In a statement made to police shortly after his arrest, and admitted at trial as State's Exhibit 2, [Gilson] stated that on August 17, 1995, he had put Shane in the bathtub as punishment. [Gilson] said he was trying to teach Shane a lesson, so he spanked him and put him in the bathtub where he was to remain until he stopped the disruptive behavior. He said the water in the bathtub was initially warm to help the pain from the spanking, but then he changed it to a cold bath. [Gilson] said Shane was crying as Coffman talked to him about his behavior. He said he then laid down on the couch to watch television with the rest of the kids where he eventually fell asleep. Coffman was in and out of the bathroom talking to Shane before she went to the bedroom to lay down. A while later, Coffman came into the living room in tears and told [Gilson] to come to the bathroom. He said Coffman had taken Shane out of the bathtub and laid him on the floor. Shane's lips were blue and he was not breathing. [Gilson] said he performed CPR for approximately an hour to an hour and half. When his efforts were

4

unsuccessful, [Gilson] took the comforter off of his bed, wrapped Shane up and placed him back in the bathtub.

[Gilson] said he and Coffman discussed what to do next. He said Coffman was worried that the Department of Human Services (hereinafter DHS) would take her kids away if the authorities found out Shane had died. So they left Shane in the bathtub, waiting until the other children had gone to sleep to remove him from the house. [Gilson] said they carried Shane outside and placed him in the back of a truck. He said they discussed "just dumping him somewhere" or "bury[ing] him out in the middle of the boonies." But they decided neither of those options were right and "even though he wasn't alive he would still be part of the family bein (sic) on her property, . . . thought about putting him in the freezer, it wouldn't hurt him and then concreting it over. And making a flower bed out of it." So [Gilson] and Coffman took Shane's body to the freezer located next to Coffman's trailer and put him inside. [Gilson] said he and Coffman told the other children Shane had run away.

Bertha Jean Coffman testified at trial to disciplining her children by making them stand at the time-out wall, and spanking them, only on their bottoms, with a cloth belt or a wooden paddle. She also testified that [Gilson] disciplined her children by spanking them with the wooden paddle, but at various places on their bodies. Coffman stated [Gilson] had a quick temper and did not want the children tearing up his trailer.

In her statement to police on August 17, 1995, Coffman said she and [Gilson] found Shane sexually assaulting his younger brother. As punishment, they made him stand at the time-out wall, then Coffman paddled him. When Shane refused to stand at the wall, Coffman spanked him again. When Shane still would not do as Coffman directed, she screamed at him. Shane then fainted. When Coffman could not get a response from Shane, she put a piece of ice on his chest. When he still did not respond, Coffman picked him up and took him to the bathroom where she placed him in a tub of cool water. She said Shane eventually came to and wanted to get out of the tub. She said he slipped and hit his head on the faucet. Coffman stated she pushed on Shane's shoulders to keep him in the bathtub. They struggled, and the shower doors were knocked off their railing. Coffman called for [Gilson] to come and fix the doors. [Gilson] left the living room where he had been watching television with the other children and put the doors back on their railings. [Gilson] left the bathroom. Coffman and Shane struggled again. [Gilson] returned to the

5

bathroom to see what the noise was about. He saw the doors had fallen off again so he took them and set them on the floor. Coffman said she remained in the bathroom with Shane while [Gilson] went back to the living room.

After a while, [Gilson] stepped into the bathroom and told Coffman to leave Shane alone for a while. So Coffman left the bathroom to get Shane dry clothes and prepare lunch. When she saw that [Gilson] had already prepared lunch, Coffman laid down on her bed. She was awakened by a noise in the bathroom and saw [Gilson] coming out of the bathroom. When asked how Shane was, [Gilson] responded he was fine and that he was blowing bubbles. Coffman sat down to have a cup of coffee, then decided to check on Shane. She found him quiet but not breathing. She called for [Gilson] and they pulled Shane out of the bathtub and gave him CPR. She said they waited until the other children were asleep before taking the body to the freezer. Coffman also stated that once Shane died, Isaac and Tia began receiving the brunt of the discipline from [Gilson].

Shane's skeletal remains were not found until approximately six (6) months after his death. Therefore, the medical examiner, Dr. Balding, was not able to make a determination as to the cause of death. The medical examiner did testify to injuries to certain bones which were evident upon his examination of the remains. The injuries included a fracture to the right jawbone. The injury was determined to be "acute" as it showed no signs of healing, and therefore was probably less than a week old at the time of death. Another fracture was also found on the left side of the skull. Dr. Balding testified the two fractures were the result of two different blunt force blows. A tooth was missing from the right jaw. Fractures were also found in the collarbone, shoulder blades, numerous ribs, both legs, and several vertebrae in the spine. All the fractures were ruled acute, and not the result of normal childhood play.

[Gilson] and Bertha Jean Coffman were jointly charged with first degree murder by child abuse in the death of Shane Coffman, and one count of injury to a minor child for the abuse suffered by each of the remaining children. They were also jointly charged with conspiracy to unlawfully remove a dead body and unlawful removal of a dead body. [The State filed a bill of particulars asserting that Gilson and Coffman should be sentenced to death in connection with the first degree murder charge on the basis of two aggravating factors: (1) that the murder was especially heinous, atrocious and cruel; and (2) the existence of a probability that they would

6

commit criminal acts of violence that would pose a continuing threat to society.] On August 20, 1997, approximately eight (8) months prior to [Gilson]'s trial, Coffman entered *Alford* [footnote omitted] pleas to all counts. [Gilson] was subsequently tried and convicted on all charges except he was found not guilty of committing injury to a minor child as to Jeremy, Tranny and Crystal.

Gilson v. State, 8 P.3d 883, 895-98 (Okla. Crim. App. 2000) (Gilson I) (internal paragraph numbers omitted). The jury, in connection with the two injury to a minor child convictions, concluded Gilson's sentence should be life imprisonment. At the conclusion of the second-stage proceedings, which were conducted as a result of Gilson's murder conviction, the jury found the existence of both aggravating factors alleged by the State and recommended a death sentence. Gilson was formally sentenced by the state trial court at a later hearing.

Gilson filed a direct appeal challenging his convictions and sentences. On July 26, 2000, the OCCA, with one judge dissenting, affirmed Gilson's convictions and sentences. Gilson I, 8 P.3d at 929. The OCCA subsequently denied Gilson's request for rehearing. Gilson filed a petition for writ of certiorari with the United States Supreme Court. That petition was denied by the Supreme Court on April 2, 2001. Gilson v. Oklahoma, 532 U.S. 962 (2001).

While his direct appeal was still pending before the OCCA, Gilson, in accordance with Oklahoma procedural rules, filed an application for post-conviction relief with the OCCA. The OCCA denied the application for post-conviction relief on September 1, 2000, in an unpublished opinion.

7

On August 20, 2001, Gilson initiated this federal habeas corpus action by filing a pro se motion to proceed in forma pauperis and a motion for appointment of counsel. Gilson's motion for appointment of counsel was granted and, on March 29, 2002, Gilson filed his federal habeas corpus petition asserting eleven grounds for relief. ROA, Doc. 13. On August 9, 2006, the district court issued an opinion and order denying Gilson's petition. Id., Doc. 29. The district court granted Gilson a certificate of appealability on six issues, and we subsequently granted Gilson a certificate of appealability on one additional issue.

## II. STANDARD OF REVIEW

Our review of Gilson's appeal is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). Snow v. Sirmons, 474 F.3d 693, 696 (10th Cir. 2007). Under AEDPA, the standard of review applicable to a particular claim depends upon how that claim was resolved by the state courts. Id.

If a claim was addressed on the merits by the state courts, we may not grant federal habeas relief on the basis of that claim unless the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," id. § 2254(d)(2). "When reviewing a state court's application of federal law, we are precluded from issuing the writ simply because we conclude in our independent judgment that the state court applied the law erroneously or incorrectly."

8

McLuckie v. Abbott, 337 F.3d 1193, 1197 (10th Cir. 2003). "Rather, we must be convinced that the application was also objectively unreasonable." Id. "This standard does not require our abject deference, . . . but nonetheless prohibits us from substituting our own judgment for that of the state court." Snow, 474 F.3d at 696 (internal quotation marks omitted).

If a claim was not resolved by the state courts on the merits and is not otherwise procedurally barred, our standard of review is more searching. That is, because § 2254(d)'s deferential standards of review do not apply in such circumstances, we review the district court's legal conclusions de novo and its factual findings, if any, for clear error. McLuckie, 337 F.3d at 1197.

## III. ANALYSIS

*Split verdict on theories underlying child abuse murder conviction*

Gilson was charged with first degree child abuse murder in violation of Okla. Stat. tit. 21 § 701.7(C). That statute provides as follows:

> A person commits murder in the first degree when the death of a child results from the willful or malicious injuring, torturing, maiming or using of unreasonable force by said person or who shall willfully cause, procure or permit any of said acts to be done upon the child pursuant to Section 7115 of Title 10 of the Oklahoma Statutes. It is sufficient for the crime of murder in the first degree that the person either willfully tortured or used unreasonable force upon the child or maliciously injured or maimed the child.

Okla. Stat. tit. 21 § 701.7(C). According to the record, the State alleged two alternative theories of how Gilson violated § 701.7(C), i.e., that Gilson either was directly

9

responsible for willfully or maliciously injuring, torturing, maiming or using unreasonable force upon Shane, or that he knowingly permitted Bertha Jean Coffman to do so.

> At trial, the State submitted a verdict form for the murder charge that listed not only the option of guilty or not guilty, but also stated:
>
>> FURTHER, we make the following finding of fact as to the basis for our verdict of guilty:
>> [  ]   Unanimous as to child abuse murder
>> [  ]   Unanimous as to permitting child abuse murder
>> [  ]   Divided as to the underlying theory

Gilson I, 8 P.3d at 898-99. Gilson objected to the underlying instruction that informed the jury "that while their verdict of guilt as to first degree murder must be unanimous, they need not unanimously agree as to the theory under which they arrived at their verdict." Id. at 899. The state trial court overruled Gilson's objection and adopted the verdict form submitted by the State. "When the jury concluded its deliberations and returned its verdicts, in addition to finding [Gilson] guilty, the last box listed above ('divided as to the underlying theory') was checked . . . ." Id.

In these federal habeas proceedings, Gilson argues that his "conviction for capital murder, based on a divided jury verdict as to whether he was guilty of 'committing' the child abuse that led to Shane's death, or of 'permitting' such abuse, is in violation of his constitutional right to due process . . . ." Aplt. Br. at 22.

    a) *Schad v. Arizona*

The "clearly established federal law" that Gilson cites in support of his argument is

the Supreme Court's decision in <u>Schad v. Arizona</u>, 501 U.S. 624 (1991). The petitioner

in <u>Schad</u>, Edward Schad, Jr., was charged in Arizona state court with first-degree murder.

During Schad's trial, the prosecutor advanced alternative theories of premeditated and

felony murder, while Schad himself claimed that, at most, he was guilty of mere theft.

The jury rejected Schad's assertions and, in a general verdict, convicted him of first-

degree murder. Schad was subsequently sentenced to death in connection with this

conviction. On direct appeal, Schad argued that the state trial court erred in not requiring

the jury to agree on a single theory of first-degree murder. The Arizona Supreme Court

rejected that argument and affirmed Schad's conviction and sentence. Schad

subsequently sought and was granted a petition for writ of certiorari by the United States

Supreme Court on that issue.

Although Schad urged the Supreme Court "to decide th[e] case by holding that the

Sixth, Eighth, and Fourteenth Amendments require a unanimous jury in state capital

cases," 501 U.S. at 630, the Court[1] declined to do so. More specifically, the Court noted

that it "ha[d] never suggested that in returning general verdicts in such cases the jurors

should be required to agree upon a single means of commission, any more than the

---

[1] Justice Souter wrote the plurality opinion in <u>Schad</u>, which was joined by three other Justices. Justice Scalia authored a separate concurrence (which, together with Justice Souter's opinion, controlled the outcome). For purposes of convenience, we refer to Justice Souter's plurality opinion as the decision of "the Court." <u>See</u> <u>Marks v. United States</u>, 430 U.S. 188, 193 (1977) ("When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." (internal quotation marks omitted)).

11

indictments were required to specify one alone."[2]  Id. at 631.  Instead, the Court

concluded that Schad's "real challenge [wa]s to Arizona's characterization of first-degree

murder as a single crime as to which a verdict need not be limited to any one statutory

alternative . . . ."  Id. at 630-31.  In other words, the Court concluded that the

constitutional issue presented by Schad was "one of the permissible limits in defining

criminal conduct, as reflected in the instructions to jurors applying the definitions," and

"not one of jury unanimity."  Id. at 631.

Addressing that constitutional issue head-on, the Court acknowledged that there

was a "point at which differences between means become so important that they may not

reasonably be viewed as alternatives to a common end, but must be treated as

differentiating what the [Due Process Clause] requires to be treated as separate offenses."

Id. at 633.  For example, the Court noted, "nothing in [its] history suggest[ed] that the

Due Process Clause would permit a State to convict anyone under a charge of 'Crime' so

generic that any combination of jury findings of embezzlement, reckless driving, murder,

---

[2] Justice Scalia offered the following compelling rationale for why no such rule exists:

> As the plurality observes, it has long been the general rule that when a single crime can be committed in various ways, jurors need not agree upon the mode of commission.  That rule is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict.  When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her.

Schad, 501 U.S. at 649-50 (Scalia, J., concurring) (citations omitted).

burglary, tax evasion, or littering . . . would suffice for conviction." Id.

In "attempt[ing] to define what constitutes an immaterial difference as to mere means and what constitutes a material difference requiring separate theories of crime to be treated as separate offenses subject to separate jury findings," id., the Court indicated it would afford substantial deference to a state court's interpretation of its own state statutes. Specifically, the Court stated that "[i]f a State's courts have determined that certain statutory alternatives are mere means of committing a single offense, rather than independent elements of the crime, [it] simply [would] not [be] at liberty to ignore that determination and conclude that the alternatives [we]re, in fact, independent elements under state law." Id. at 636. In Schad's case, the Court noted, "by determining that a general verdict as to first-degree murder [wa]s permissible under Arizona law, the Arizona Supreme Court ha[d] effectively decided that, under state law, premeditation and the commission of a felony [we]re not independent elements of the crime, but rather [we]re mere means of satisfying a single mens rea element." Id. at 637.

That still left, however, the issue of "whether Arizona's choice [wa]s unconstitutional." Id. In resolving this issue, the Court began by stating that its "sense of appropriate specificity [wa]s a distillate of the concept of due process with its demands for fundamental fairness . . . and for the rationality that is an essential component of that fairness." Id. Continuing, the Court stated that, "[i]n translating these demands for fairness and rationality into concrete judgments about the adequacy of legislative determinations, [it would] look both to history and wide practice as guides to fundamental

13

values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that m[ight] satisfy the *mens rea* element of a single offense." Id. "The enquiry," the Court held, "is undertaken with a threshold presumption of legislative competence to determine the appropriate relationship between means and ends in defining the elements of a crime." Id. at 637-38.

The Court held that "[t]he use . . . of due process as a measurement of the sense of appropriate specificity assumes the importance of history and widely shared practice as concrete indicators of what fundamental fairness and rationality require." Id. at 640. Expanding on this notion, the Court explained:

> Where a State's particular way of defining a crime has a long history, or is in widespread use, it is unlikely that a defendant will be able to demonstrate that the State has shifted the burden of proof as to what is an inherent element of the offense, or has defined as a single crime multiple offenses that are inherently separate. Conversely, a freakish definition of the elements of a crime that finds no analogue in history or in the criminal law of other jurisdictions will lighten the defendant's burden.

Id. Applying these principles to the circumstances presented by Schad's case, the Court concluded it was "significant that Arizona's equation of the mental states of premeditated murder and felony murder as species of the blameworthy state of mind required to prove a single offense of first-degree murder f[ound] substantial historical and contemporary echoes." Id. From a historical perspective, the Court noted that at common law, "[t]he intent to kill and the intent to commit a felony were alternative aspects of the single concept of 'malice aforethought.'" Id. From a contemporary perspective, the Court noted that most state statutes "retained premeditated murder and some form of felony murder . .

14

. as alternative means of satisfying the mental state that first-degree murder presupposes." Id. at 641. Further, the Court, citing a series of state-court decisions issuing from 1903 through the date of the Court's decision, concluded "there [wa]s sufficiently widespread acceptance of the two mental states as alternative means of satisfying the mens rea element of the single crime of first-degree murder to persuade [it] that Arizona ha[d] not departed from the norm." Id. at 642. "Such historical and contemporary acceptance of Arizona's definition of the offense and verdict practice," the Court noted, "[wa]s a strong indication that they d[id] not offen[d] some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental . . . ." Id. (internal quotation marks omitted).

The Court also considered "the function that differences of mental state perform in defining the relative seriousness of otherwise similar or identical criminal acts." Id. at 643. According to the Court, "[i]f . . . two mental states are supposed to be equivalent means to satisfy the mens rea element of a single offense, they must reasonably reflect notions of equivalent blameworthiness or culpability, whereas a difference in their perceived degrees of culpability would be a reason to conclude that they identified different offenses altogether." Id. Applying these principles to Schad's case, the Court noted that "[t]he question . . . [wa]s whether felony murder [could] ever be treated as the equivalent of murder by deliberation, and in particular whether robbery murder as charged in [Schad's] case [could] be treated as thus equivalent." Id. at 644. Citing its decision in Tison v. Arizona, 481 U.S. 137 (1987), the Court concluded that "[w]hether or

15

not everyone would agree that the mental state that precipitates death in the course of robbery is the moral equivalent of premeditation, it [wa]s clear that such equivalence could reasonably be found, which [wa]s enough to rule out the argument that this moral disparity bar[red] treating them as alternative means to satisfy the mental element of a single offense." Id.

   b. *The OCCA's rejection of Gilson's* Schad*-based argument*

Gilson first raised his due process, Schad-based argument on direct appeal. The OCCA purported to reject the argument on the merits. In doing so, the OCCA offered the following lengthy explanation for its decision:

> In the second part of his argument, [Gilson] asserts his right to a unanimous verdict was violated by the verdict forms allowing the jury to return a "divided as to underlying theory" guilty verdict. [Gilson] argues that as he was charged in the alternative with child abuse murder by the commission of child abuse or by the permitting of child abuse which resulted in first degree murder, the jury's verdict showed a disagreement as to "just what [he] did." [citation and footnote omitted]. [Gilson] acknowledges this Court has said that a general verdict of guilt satisfies due process and unanimity concerns where a defendant is charged in the alternative with malice aforethought and felony murder, so long as a prima facie case is made for each alternative. See James v. State, 637 P.2d 862, 866 (Okl.Cr.1981). However, he asserts his case is distinguishable by its unique circumstances. [Gilson] submits that the jury disagreement in his case went to the legal, rather than the factual, basis of the crime charged, "because 1) 'committing' and 'permitting' child abuse murder are conceptually distinct crimes and 2) these alternative theories of guilt are fundamentally repugnant to each other." [citation omitted]. [Gilson] argues the contradictory nature of the alternative crimes charged is illustrated by the differing actus reus requirements for each crime.
>
> The State argues in response that committing and permitting child abuse are merely different means by which child abuse murder may be committed. Citing cases from this Court, the State argues the jury was not required to

16

agree on the specific means by which the crime was committed, only that the defendant committed the crime charged.

Both [Gilson] and the State cite to Schad v. Arizona, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991). [Gilson] argues that Schad supports a finding that first degree murder by the commission of child abuse and first degree murder by permitting child abuse are separate offenses containing independent elements upon which the jury must be in unanimous agreement. The State relies on Schad for the proposition that where there are alternatives to proving the actus reus of the offense, there is no general requirement that the jury reach a unanimous agreement on the preliminary factual issues which underlie the verdict.

In Schad, the Supreme Court addressed the constitutionality of the Arizona Supreme Court's holding that a general verdict as to first-degree murder is permissible under Arizona law as premeditation and the commission of a felony are not independent elements of the crime, but rather are mere means of satisfying a single mens rea element. In its analysis, the Court looked "both to history and wide practice as guides to fundamental values, as well as to narrower analytical methods of testing the moral and practical equivalence of the different mental states that may satisfy the mens rea element of a single offense." 501 U.S. at 637-38, 111 S.Ct. at 2500.

The Court found the language of the Arizona first-degree murder statute was identical in all relevant respects to the language of the first statute defining murder by differences of degree, passed by the Pennsylvania Legislature in 1794. 501 U.S. at 641, 111 S.Ct. at 2502. The Court also looked to decisions from other state courts which agreed "'it was not necessary that all the jurors should agree in the determination that there was a deliberate and premeditated design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of a felony, or an attempt to commit one; it was sufficient that each juror was convinced beyond a reasonable doubt that the defendant had committed the crime of murder in the first degree as that offense is defined by the statute.'" Id., quoting People v. Sullivan, 173 N.Y. 122, 127, 65 N.E. 989, 989-990 (1903). [footnote omitted]. Although recognizing the state courts were not unanimous in this respect, the Supreme Court decided there was sufficient widespread acceptance of the two mental states of premeditation and felony-murder as alternative means of satisfying the mens rea element of the single crime of first-degree murder to persuade the

17

Court that Arizona had not departed from the norm. 501 U.S. at 641, 111 S.Ct. at 2502.

Having made these determinations, the Court stated "[t]he question, rather, is whether felony murder may ever be treated as the equivalent of murder by deliberation, and in particular whether robbery murder as charged in this case may be treated as thus equivalent." 501 U.S. at 644, 111 S.Ct. at 2503. The Supreme Court concluded:

> Whether or not everyone would agree that the mental state that precipitates death in the course of robbery is the moral equivalent of premeditation, it is clear that such equivalence could reasonably be found, which is enough to rule out the argument that this moral disparity bars treating them as alternative means to satisfy the mental element of a single offense.

Id. at 501 U.S. at 644, 111 S.Ct. at 2503-4.

While recognizing that their "considerations [did not] exhaust the universe of those potentially relevant to judgments about the legitimacy of defining certain facts as mere means to the commission of one offense", the Supreme Court found the Arizona law "did not fall beyond the constitutional bounds of fundamental fairness and rationality." 501 U.S. at 645, 111 S.Ct. at 2504.

In the present case we are not concerned with the alternatives of premeditated and felony murder, but with those of child abuse murder by permitting child abuse and child abuse murder by the commission of child abuse. [Gilson] was charged under 21 O.S.1991, § 701.7(C) which provides:

> C. A person commits murder in the first degree when the death of a child results from the willful or malicious injuring, torturing, maiming or using of unreasonable force by said person or who shall willfully cause, procure or permit any of said acts to be done upon the child pursuant to Section 7115 of Title 10 of the Oklahoma Statutes. It is sufficient for the crime of murder in the first degree that the person either willfully tortured or used unreasonable force upon the child or maliciously injured or maimed the child.

18

This section of the first degree murder statute sets out different ways in which the offense of first degree murder by child abuse may be committed. It may be committed by the willful or malicious injuring, torturing, maiming, or using of unreasonable force by the defendant upon a child, or by the defendant's willfully causing, procuring or permitting the acts of child abuse. This section specifically states that "a person commits murder in the first degree when the death of a child results . . ." from either "willful or malicious injury" or "willfully permitting" those acts to be done. Therefore, under the statutory language the crime of first degree murder by child abuse is committed under either circumstance. This provision is not unlike the felony-murder provisions of section 701.7(B) which set forth alternative ways of committing felony-murder.

[Gilson] is correct in his argument that including the intent to commit child abuse into the first degree murder statute is a relatively recent enactment, see Tucker v. State, 675 P.2d 459, 461 (Okl.Cr.1984), and that the crime of child abuse murder by permitting child abuse did not exist prior to 1982. See 1982 Okla. Sess. Laws c. 279 § 1. However, the fact that the legal culpability of a defendant whose abuse of a child results in that child's death or who permits a child to be abused to the extent that death results has only recently been acknowledged by this State does not mean the Legislature cannot define first degree child abuse murder to have been committed either by the actual commission of the acts of abuse or by the willful permitting of the acts to abuse to occur. With the enactment of § 701.7(C) the Legislature has clearly stated its intention to punish as first degree murder the use of unreasonable force upon a child or the permitting of unreasonable force to be used upon a child when the death of a child results.

Having found the commission of child abuse and the permitting of child abuse to be alternative means to committing the crime of first degree murder by child abuse, "[t]he constitutional requirement of a unanimous jury verdict applies only to the ultimate issue of the appellant's guilt or innocence of the crime charged, not the alternative means by which the crime was committed." Rounds v. State, 679 P.2d 283, 287 (Okl.Cr.1984). In Powell v. State, 906 P.2d 765, 775-76 (Okl.Cr.1995), this Court stated:

> [T]his Court has reaffirmed its prior holdings that failure of a jury to indicate the basis of their finding of guilt was not error where there was but a single crime charged, i.e. first degree

19

murder. "Whether or not [murder] was committed with malice aforethought, or during the commission of a felony goes to the factual basis of the crime." When the jury verdict is unanimous that a defendant committed murder in the first degree, such a verdict satisfies due process. Further, there is no due process violation when all of the elements of the crime charged were proven. (citations omitted).

See also Neill v. State, 896 P.2d 537, 552-53 (Okl.Cr.1994), cert. denied, 516 U.S. 1080, 116 S.Ct. 791, 133 L.Ed.2d 740 (1996); Crawford v. State, 840 P.2d 627, 640 (Okl.Cr.1992); Newsted v. State, 720 P.2d 734, 737-38 (Okl.Cr.), cert. denied, 479 U.S. 995, 107 S.Ct. 599, 93 L.Ed.2d 599 (1986); James v. State, 637 P.2d 862, 865 (Okl.Cr.1981).

The evidence in the present case showed a prima facie case was made and all of the elements were proven to support a finding of guilt as to either child abuse murder by the commission of child abuse or child abuse murder by permitting child abuse. The evidence supporting the conclusion that [Gilson] was the perpetrator of the abuse inflicted upon Shane came from the other Coffman children who testified that both [Gilson] and their mother beat Shane the day of the murder, carried him to the bathtub, and stayed with him in the bathroom while he cried and screamed. Supporting evidence can also be found in Coffman's statement that she saw [Gilson] coming out of the bathroom and then found Shane in the bathroom not breathing.

Evidence supporting a conclusion that [Gilson] permitted the abuse comes from Coffman's statement that she was in the bathroom struggling with Shane when the shower doors fell down. [Gilson] entered the bathroom, not once but twice to attend to the shower doors. [Gilson]'s own statement supports the conclusion that he was aware that Coffman was abusing Shane in the bathroom.

The jury's verdict of guilt indicating it was divided as to the underlying theory was a disagreement as to the factual basis of the offense and as to the manner in which the crime was committed. As the Supreme Court stated in Schad:

We have never suggested that in returning general verdicts in such cases the jurors should be required to agree upon a single means of commission, any more than the indictments were

20

required to specify one alone. In these cases, as in litigation generally, "different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict." (citation omitted).

Id. at 501 U.S. at 631-32, 111 S.Ct. at 2497.

Here, there was a single crime charged-first degree murder by child abuse. Whether or not it was committed through the commission of child abuse or through the permitting of child abuse goes to the factual basis of the crime. The jury verdict was unanimous that [Gilson] committed the crime. Such a verdict satisfies due process. See Plunkett v. State, 719 P.2d 834, 841 (Okl.Cr.), cert. denied, 479 U.S. 1019, 107 S.Ct. 675, 93 L.Ed.2d 725 (1986).

The enactment of § 701.7(C), a separate provision within the first degree murder statute to address the death of a child as a result of child abuse, is indicative of the Legislature's intent within the last two decades to draft legislation aimed specifically at the protection and welfare of children. See 10 O.S.Supp.1993, § 401 et. seq. (Oklahoma Child Care Facilities Licensing Act); 10 O.S. Supp.1995, § 7001-1.1 et. seq. (the Oklahoma Children's Code); and, 10 O.S.Supp.1995, § 7101 et. seq. (Oklahoma Child Abuse Reporting and Prevention Act). Although specifically directed at situations where child abuse has resulted in death, by enacting 21 O.S.1991, § 701.7(C) the Legislature has merely created another way of committing first degree murder.

The language of the statute, setting forth alternative means of committing the crime of child abuse murder, makes it analogous to the crime of felony-murder. Under 21 O.S.1991, § 701.7(B) felony-murder is committed when a death results from a defendant's commission of any of several specifically listed underlying felonies. In a felony-murder prosecution, proof of the underlying felony is needed to prove the intent necessary for a felony murder conviction. Fields v. State, 923 P.2d 624, 634 (Okl.Cr.1996), cert. denied, 520 U.S. 1216, 117 S.Ct. 1704, 137 L.Ed.2d 829 (1997). Further, when the crime is charged in the alternative, with more than one felony charged as the underlying felony, a constitutionally unanimous verdict is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged

and not with respect to alternative means by which the crime was committed. Blackwell v. State, 663 P.2d 12, 16 (Okl.Cr.1983).

We find the child abuse murder statute should be interpreted in the same manner as § 701.7(B). Proof of the underlying act of child abuse is needed to prove the intent necessary for a child abuse murder conviction. See Fairchild v. State, 998 P.2d 611, 618-19 (Okl.Cr.1999) (holding crime of first degree murder by child abuse is a general intent crime). A constitutionally unanimous verdict is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged and not with respect to alternative means by which the crime was committed.

Gilson I, 8 P.3d at 900-03 (internal paragraph numbers omitted).

*c. Gilson's entitlement to federal habeas relief on this claim*

The above-quoted language makes apparent that the OCCA properly conducted the first part of the Schad analysis. Specifically, it concluded as a matter of state law that, "[w]ith the enactment of § 701.7(C), the [Oklahoma] Legislature ha[d] clearly stated its intention to punish as first degree murder the use of unreasonable force upon a child or the permitting of unreasonable force to be used upon a child when the death of a child results." Gilson I, 8 P.3d at 902. Unfortunately, however, the OCCA failed to conduct the second, and arguably more important, part of the Schad analysis, i.e., determining whether the Oklahoma Legislature's decision to treat "the commission of child abuse and the permitting of child abuse [as] alternative means to committing the crime of first degree murder by child abuse" was consistent with principles of due process. In place of this analysis, the OCCA simply reviewed the evidence presented at trial and concluded that "a prima facie case was made and all of the elements were proven to support a

22

finding of guilt as to either child abuse murder by the commission of child abuse or child abuse murder by permitting child abuse." Id. at 902.

Conducting the second part of the Schad analysis de novo, we conclude that Oklahoma's choice is consistent with principles of due process. To be sure, Oklahoma's decision to directly include both the commission and permission of abuse resulting in the death of a child in its definition of first-degree murder appears to be unique among the states.[3] That said, however, there is contemporary support from other states for the notion of treating the willful commission and willful permission of child abuse as alternative means of satisfying the actus reus requirements of a single offense. In particular, several other states treat willful commission and willful permission as alternative means of satisfying the actus reus requirement of lesser criminal offenses. E.g., Cal. Penal Code § 11165.3 (defining the crime of "Willful harming or endangering of child" to include "a situation in which any person willfully causes or permits any child to suffer, or inflicts thereon, unjustifiable physical pain or mental suffering"); Conn. Gen. Stat. § 53-21

---

[3] Although we have not found another first-degree murder statute similar to Oklahoma's, we find it significant that other states routinely allow criminal defendants to be charged with first-degree felony murder when death results from the commission or permission of severe child abuse. E.g., People v. Morgan, 170 P.3d 129, 147 (Cal. 2007) (noting that a violation of California's felony child abuse statute "merges with a resulting homicide"); People v. Moore, No. 269246, 2007 WL 2742781 at *3 (Mich. App. Sept. 20, 2007) ("this case involved felony murder . . . with the underlying felony of first-degree child abuse"); Tenn Code Ann. § 39-13-202(a)(2) (defining first degree murder to include the "killing of another committed in the perpetration of or attempt to perpetrate . . . aggravated child abuse [and] aggravated child neglect"). Thus, the end result in those states is effectively the same as in Oklahoma, i.e., the defendant in such a case is charged with first-degree murder.

23

(defining the crime of "Injury or risk of injury to, or impairing morals of, children" to include any person who "wilfully or unlawfully causes or permits any child . . . to be placed in such situation that the life or limb of such child is endangered"); Idaho Code Ann. § 18-1501 (defining the crime of "Injury to children" to include "[a]ny person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer"); 720 Ill. Comp. Stat. 5/12-21.6 (defining the crime of "Endangering the life or health of a child" to include any person who "willfully cause[s] or permit[s] the life or health of a child under the age of 18 to be endangered"); Nev. Rev. Stat. § 200.508 (defining the crime of "Abuse, neglect or endangerment of child" to include both "wilfully caus[ing]" and "permit[ting] or allow[ing]"); Va. Code. Ann. § 40.1-103 (defining the crime of "Cruelty and injuries to children" to include "willfully . . . caus[ing] or permit[ting] the life of [a] child to be endangered"); Wyo. Stat. Ann. § 6-4-405 (defining the crime of "Endangering children" to include "willfully caus[ing] or permit[ting]").[4]  As noted by the Supreme Court in Schad, it is "unlikely" that such relatively common legal definitions would "retain wide acceptance" if they were "at odds with notions of fairness and rationality sufficiently fundamental to be

---

[4] Although Gilson argues there is no support in history or state-wide practice for the imposition of capital punishment for the permitting of severe child abuse, that is clearly not the proper inquiry under Schad.  Rather, the proper constitutional inquiry under Schad is whether there is historical and/or contemporary support for the Oklahoma Legislature's decision to treat the two acts at issue as alternative methods of meeting a single actus reus element of the crime of first-degree child abuse murder.  The question of whether it is permissible to impose capital punishment for such a crime is a separate constitutional question (i.e., an Eighth Amendment rather than a Due Process issue).

24

comprehended in due process." 501 U.S. at 642. Moreover, Gilson has not established that the two means at issue, i.e., willful commission and willful permission, for proving the actus reus requirement of the first-degree murder charge at issue here "are so disparate as to exemplify two inherently separate offenses." Id. at 643. Thus, we conclude Gilson is not entitled to federal habeas relief on this issue.

*Enmund/Tison violation*

Gilson next argues, citing the Supreme Court's decisions in Enmund v. Florida, 458 U.S. 782, (1982), and Tison v. Arizona, 481 U.S. 137 (1987), that the imposition of the death penalty violates his Eighth Amendment rights because the jury in his case did not unanimously find either that he personally participated in the killing of Shane Coffman or that he possessed the requisite intent to make him eligible for the death penalty.

*a) The decisions in Enmund and Tison*

In Enmund and Tison, the Supreme Court explored the degree of culpability necessary for the imposition of capital punishment in cases involving felony-murder convictions. In doing so, both cases looked to the Cruel and Unusual Punishments Clause of the Eighth Amendment, which prohibits "punishments which by their excessive length or severity are greatly disproportioned to the offenses charged." Enmund, 458 U.S. at 788 (internal quotation marks omitted).

In Enmund, the Court "explicitly dealt with two distinct subsets of all felony murders . . . ." Tison, 481 U.S. at 149. "At one pole was [defendant] Enmund himself;

25

the minor actor in an armed robbery, not on the scene, who neither intended to kill nor was found to have had any culpable mental state." Id. "The Court held that capital punishment was disproportional in these cases," and thus violative of the Eighth Amendment. Id. at 150. At the other pole was "the felony murderer who actually killed, attempted to kill, or intended to kill." Id. The Court held that the Eighth Amendment posed no hurdle to the imposition of capital punishment in such cases.

In Tison, the Court expanded on the principle of proportionality by addressing two related cases that fell between the categories of felony-murder expressly addressed in Enmund. The petitioners in Tison, two brothers, had assisted their inmate father and another convict in escaping from prison. During the course of the escape, the group's car broke down and one of the brothers flagged down a passing car which contained a family of four. The group proceeded to kidnap and rob the family. While the brothers were nearby, the father and the other convict shot and killed all four members of the kidnapped family. Neither brother attempted to assist the victims before, during, or after the shooting. Moreover, both brothers continued on with the two escapees and the group was not apprehended until several days later. Id. at 151-52.

The Supreme Court concluded that although neither petitioner actually killed or specifically intended to kill any of the victims, the Eighth Amendment did not prohibit them from being subjected to the death penalty. In reaching this conclusion, the Court noted that "[a] critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime." Id. at 156.

26

"Deeply ingrained in our legal tradition," the Court noted, "is the idea that the more purposeful is the criminal conduct, the more serious is the offense, and, therefore, the more severely it ought to be punished." Id. In turn, the Court noted that "the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." Id. at 157-58. Ultimately, the Court held that "major participation in the felony committed, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement." Id. at 158.

Although not cited by Gilson, the Supreme Court's decision in Cabana v. Bullock, 474 U.S. 376 (1986), is also relevant to our Enmund/Tison analysis. Cabana was a procedural case in which the Court "determine[d] in whose hands the [Enmund/Tison-mandated] decision that a defendant possesses the requisite degree of culpability properly lies." 474 U.S. at 378. In addressing that issue, the Court emphasized that its "ruling in Enmund d[id] not concern the guilt or innocence of the defendant" and "establishe[d] no new elements of the crime of murder that must be found by the jury." Id. at 385. Continuing, the Court noted that "[t]he decision whether a particular punishment–even the death penalty–is appropriate in any given case is not one that [it] ha[d] ever required to be made by a jury." Id. To the contrary, the Court noted, "the decision whether a sentence is so disproportionate as to violate the Eighth Amendment in any particular case,

27

like other questions bearing on whether a criminal defendant's constitutional rights have been violated, has long been viewed as one that a trial judge or an appellate court is fully competent to make." Id. at 386. Thus, the Court stated, "Enmund does not impose *any* particular form of procedure upon the States." Id. If a criminal defendant's conduct satisfies the Enmund or Tison requirements for imposition of the death penalty, the Court held, "the Eighth Amendment itself is not violated by his or her execution regardless of who makes the determination of the requisite culpability . . . ." Id. In other words, "[a]t what precise point in its criminal process a State chooses to make the Enmund determination is of little concern from the standpoint of the Constitution." Id. Thus, the Court held, "when a federal habeas court reviews a claim that the death penalty has been imposed on one who" does not meet the Enmund or Tison requirements for imposition of the death penalty, "the court's inquiry cannot be limited to an examination of jury instructions. Rather, the court must examine the entire course of the state-court proceedings against the defendant in order to determine whether, at some point in the process, the requisite factual finding as to the defendant's culpability has been made." Id. at 387. "If it has," the Court held, "the finding must be presumed correct by virtue of 28 U.S.C. § 2254(d), . . . and unless the habeas petitioner can bear the heavy burden of overcoming the presumption, the court is obliged to hold that the Eighth Amendment as interpreted in Enmund [and Tison] is not offended by the death sentence." Id. at 387-88.

   b. *The OCCA's rejection of Gilson's Enmund/Tison claim*

   Gilson first raised his Enmund/Tison claim on direct appeal. The OCCA rejected

the claim on the merits, stating as follows:

> [Gilson] contends in his second assignment of error that his death sentence violates the Eighth and Fourteenth Amendments, as well as Article II, § 9, of the Oklahoma Constitution because his conviction under 21 O.S.1991, § 701.7(C), failed to establish eligibility for the death sentence. In the first of several subpropositions, [Gilson] argues the State failed to prove he in fact killed, attempted to kill or was a major participant in a felony showing reckless indifference to human life. He contends that his death sentence can stand only if each of the theories underlying his murder conviction constitutionally justifies the imposition of a capital sentence. The State argues in response that the facts in this case are sufficient to support a finding that [Gilson] was eligible for the death sentence.

> Initially we note the record shows that after the verdicts were rendered, defense counsel moved to strike the Bill of Particulars arguing that [Gilson] was no longer constitutionally eligible for the death penalty because the jury failed to find unanimously that he committed any intentional act which led to the death of the victim. This objection has properly preserved the issue for appellate review.

> As addressed in Proposition I, the verdict in this case was a general verdict of guilt for first degree murder with the jury disagreeing as to the underlying factual basis. Therefore, we will review that factual basis in light of the applicable law to determine death eligibility.

> In Wisdom v. State, 918 P.2d 384 (Okl.Cr.1996), we held that a defendant convicted of First Degree Murder by Child Abuse who actually killed the victim by his/her own hand was eligible for the death sentence. [Gilson] acknowledges this ruling but urges reconsideration. We decline the offer. (citation omitted). Here, the evidence supports a finding that [Gilson] actually killed the victim. [Gilson] participated in beating the victim prior to the time he was taken to the bathroom. [Gilson] was in the bathroom with the victim and Coffman, and after Coffman left the room, was seen exiting the bathroom immediately before Shane was found dead. This evidence certainly renders [Gilson] eligible for the death sentence.

> This Court has not previously ruled on whether a defendant convicted of First Degree Child Abuse Murder by permitting child abuse is death eligible. Both [Gilson] and the State direct us to Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) for the application of the death penalty to a defendant who does not kill by his/her own hand. In Tison, a

29

felony-murder case in which the defendant himself did not kill, the Supreme Court held that a defendant who did not actually commit the act which caused death, but who was a major participant in the felony and who had displayed reckless indifference to human life, may be sufficiently culpable to receive the death penalty.  481 U.S. at 158, 107 S.Ct. at 1688.  The Supreme Court stated:

> Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

Id. at 481 U.S. at 157-58, 107 S.Ct. at 1688.

Tison modified the Supreme Court's holding in Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), that the Eighth Amendment forbids the imposition of the death penalty on "one . . . who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed."  Id., 458 U.S. at 797, 102 S.Ct. at 3376.

Although this Court has held that an Enmund/Tison analysis does not apply in the case of the actual killer, (citation omitted), we find it does apply in a case where the defendant was not the actual killer.  (citation omitted).  In as much as one of the underlying theories of this case is murder by the permitting of child abuse, we apply the analysis used in Enmund and Tison.

Here, the evidence shows [Gilson] was a major participant in the felony.  Acting jointly with Coffman, he took Shane outside the trailer and was party to conduct which elicited screams from the child.  He and Coffman took Shane back inside the trailer, they both took him back to the bathroom and they both remained with him in the bathroom for periods of time.  This evidence clearly supports the conclusion that his participation was major and substantial.

[Gilson] argues that, at worst, his conduct was that of an omission-of failing to protect the victim from a potentially dangerous situation-and not that of knowingly permitting the abuse to occur.  To the contrary, [Gilson]'s

conduct was not merely the nonperformance of what ought to be done, as in cases of criminal omissions. (citation omitted). His active participation in the abuse occurring inside his small trailer is very different from a passive act of failing to provide what is required by law.

We next determine whether [Gilson] displayed reckless indifference to human life. In discussing this term in Tison, the Supreme Court stated "[a] critical facet of the individualized determination of culpability required in capital cases is the mental state with which the defendant commits the crime." 481 U.S. at 157, 107 S.Ct. at 1687. The Court further stated:

> A narrow focus on the question of whether or not a given defendant "intended to kill," however, is a highly unsatisfactory means of definitively distinguishing the most culpable and dangerous of murderers. Many who intend to, and do, kill are not criminally liable at all-those who act in self-defense or with other justification or excuse . . . On the other hand, some nonintentional murderers may be among the most dangerous and inhumane of all-the person who tortures another not caring whether the victim lives or dies, or the robber who shoots someone in the course of the robbery, utterly indifferent to the fact that the desire to rob may have the unintended consequence of killing the victim as well as taking the victim's property. This reckless indifference to the value of human life may be every bit as shocking to the moral sense as an "intent to kill." . . . "[I]n the common law, intentional killing is not the only basis for establishing the most egregious form of criminal homicide . . . . For example, the Model Penal Code treats reckless killing, 'manifesting extreme indifference to the value of human life,' as equivalent to purposeful and knowing killing"). Enmund held that when "intent to kill" results in its logical though not inevitable consequence-the taking of human life-the Eighth Amendment permits the State to exact the death penalty after a careful weighing of the aggravating and mitigating circumstances. Similarly, we hold that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result.

31

Id., at 481 U.S. at 157-58, 107 S.Ct. at 1687-88.

In making the above determination, the Supreme Court also looked to the laws of several states and found that in the states which authorize capital punishment for felony-murder the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life. Id., 481 U.S. at 153-54, 107 S.Ct. at 1685-86.

This Court has addressed reckless indifference to human life only as it pertains to those who actually killed. In doing so, we found a reckless indifference to human life turns largely on the facts of the case, but was evidenced in part by the defendant's creation of a desperate situation inherently dangerous to human life. Hain v. State, 919 P.2d 1130, 1146 (Okl.Cr.), cert. denied, 519 U.S. 1031, 117 S.Ct. 588, 136 L.Ed.2d 517 (1996), and the defendant's causing the serious conscious physical suffering and death of the victim. Brown v. State, 989 P.2d 913, 931 (Okl.Cr. 1998).

The facts in the present case support a finding that [Gilson] acted with reckless indifference to human life. Acts in which [Gilson] participated outside the trailer caused injury to the child which elicited screams of pain. The child was brought back inside the trailer with swollen arms, a soft spot on his head, and irregular breathing. The victim had to be carried to the bathroom, an act in which [Gilson] again participated. Further acts in which [Gilson] participated inside the bathroom caused the victim to again scream and cry. [Gilson] was aware of the struggle between Coffman and the victim in which the victim was injured and property in the bathroom was damaged.

[Gilson]'s argument focuses on the elements of the offense of permitting child abuse and asserts that terms "willfully" and "knowingly" contained in the statute and jury instruction on first degree murder by permitting child abuse are not the equivalent of reckless indifference for human life. The elements of the offense of first degree murder by permitting child abuse have previously been addressed in this opinion. We found the evidence in this case supported a finding of the existence of those elements beyond a reasonable doubt. Here, we look beyond those elements and find [Gilson]'s conduct illustrated a reckless indifference to human life. The evidence supports a finding that [Gilson] subjectively appreciated that his conduct would likely result in the taking of innocent life. This is sufficient to make him eligible for the death penalty.

In this opinion, we have previously compared the crime of child abuse

32

murder to the crime of felony-murder for purposes of determining sufficiency of the evidence to sustain a conviction.  Such a comparison of the two offenses is again warranted during this discussion of the applicability of the death penalty.  The eligibility of a defendant convicted of child abuse murder by the permitting of child abuse is similar to that of a non-triggerman convicted of felony-murder.  In Hatch, 701 P.2d at 1040, a non-triggerman was sentenced to death for his participation in the underlying felonies.  Hatch and co-defendant Ake forced their way into the victim's home, ransacked the home at gunpoint and repeatedly threatened to kill the family of four who occupied the house.  Ake instructed Hatch to go outside, turn the car around, and "listen for the sound."  Hatch did as he was told.  Ake then shot each family member and fled the scene with Hatch.  The two adult victims died while the two children survived.  Ake v. State, 663 P.2d 1, 4 (Okl.Cr.1983).

In reviewing Hatch's death sentence, this Court stated:

> In Enmund, the Supreme Court held that the death penalty cannot be constitutionally imposed against one who is convicted of felony murder for a killing occurring during the course of a robbery who neither kills, does not intend that life be taken, nor contemplates that lethal force will be employed by others.  The evidence against appellant was that he entered his victims' home with a shotgun in hand.  His confederate entered too with a loaded handgun.  Appellant held the victims at gunpoint while Ake looted the home and attempted to rape his victims' twelve year old daughter.  Appellant also took a turn attempting to rape her.  Appellant frequently threatened the lives of his victims as they lay hog-tied on the floor.  After a discussion as to their plan of action, appellant went outside and turned his automobile around while he waited "for the sound", as Ake had instructed him to do.

> We agree with the trial court's finding that "the Defendant Hatch contemplated that a killing was not only possible, but probable and further that lethal force probably be employed."  Therefore, we find that appellant's sentences of death are justified and are in compliance with Enmund and we AFFIRM each.

Hatch, 701 P.2d at 1040.

The death sentence for a non-triggerman has also been upheld in other jurisdictions. In <u>Florida v. White</u>, 470 So.2d 1377 (Fla.1985), the defendant and two companions gained entrance to a home under a subterfuge. All three men were armed and wore masks. They tied up the people in the house and ransacked it. When one of the assailants' mask fell from his face, the three assailants discussed killing the victims. The defendant verbally opposed any killing. The two other assailants shot the victims, killing six of the eight. The three assailants then gathered up their loot and returned to the defendant's motel room where the loot was divided. The Supreme Court of Florida found that <u>Enmund</u> did not bar the imposition of the death penalty due to the defendant's presence both before, during and after the murders; his full and active role in capturing, intimidating and guarding the victims; his failure to disassociate himself from either the robbery or the murder while verbally opposing any killing; and the lack of any evidence he acted under coercion.

In <u>Fairchild v. Norris</u>, 21 F.3d 799 (8th Cir. 1994), the Eighth Circuit Court of Appeals held the evidence supported a finding that the defendant non-triggerman was eligible for the death penalty. In that case, the defendant and an accomplice kidnapped, raped and killed a woman. The Court found the defendant fully participated in the kidnapping of the victim-followed her to her car, forced her inside at gunpoint, and took money from her purse. Upon arriving at a deserted house, he subsequently raped her. The defendant was outside of the house when the victim was shot by the accomplice. However, the defendant had been present when the gun was initially shown to the victim and death threats were made. The Eighth Circuit found the defendant's participation in the armed robbery, kidnapping and rape; his leaving the victim alone with the armed accomplice, and his failure to be deterred in his conduct by the victim's pleas for mercy were sufficient for a reasonable juror to find that he was a major participant in the felonies and that he acted with reckless indifference to human life.

Accordingly, evidence in the present case of [Gilson]'s full, active and knowing participation in the underlying acts of child abuse inflicted upon Shane, his failure to disassociate himself from those acts of abuse perpetrated by Bertha Coffman, and his failure to either be deterred in his conduct or respond in any positive manner to what surely must have been pleas for mercy from the victim, were sufficient for a reasonable juror to find beyond a reasonable doubt that he was a major participant in the child abuse and that he acted with reckless indifference to human life.

34

[Gilson] next argues his death sentence should be modified as an Enmund/Tison analysis was not done by the trial court and it would be improper for this Court to conduct such a review on appeal. In Cabana v. Bullock, 474 U.S. 376, 106 S.Ct. 689, 88 L.Ed.2d 704 (1986), the Supreme Court stated that the Eighth Amendment does not require that a jury make the findings required by Enmund; an appellate court, a trial judge, or a jury may make the requisite findings. Id. at 474 U.S. at 392, 106 S.Ct. at 700. This Court can review the record and make the findings required by Enmund and Tison. Reviewing the evidence in this case, we find the facts support a finding that [Gilson]'s major participation in the felony of child abuse, combined with reckless indifference to human life, is sufficient to satisfy the Enmund culpability requirement.

Gilson I, 8 P.3d at 919-22 (internal paragraph numbers omitted).

Following the issuance of the OCCA's decision, Gilson filed a petition for rehearing with the OCCA arguing that the Supreme Court had just issued its decision in Apprendi v. New Jersey, 530 U.S. 466 (2000)[5], and that, in light of Apprendi, only a jury could make the requisite Enmund/Tison findings. On August 29, 2000, the OCCA issued an order denying Gilson's petition for rehearing and stating, in pertinent part, as follows:

We have reviewed *Apprendi* and find it is not applicable. In *Apprendi*, the Supreme Court struck down as unconstitutional the New Jersey "hate crime" statute. The New Jersey statute provided for an extended term of imprisonment if the trial judge found, by a preponderance of the evidence, that the defendant in committing the underlying criminal offense acted with a purpose to intimidate an individual or group of individuals because of race, color, gender, handicap, religion, sexual orientation or ethnicity. The Supreme Court said it was "unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed." 102 S.Ct. 2362-63. The Court further said "[i]t is equally clear that such facts must be established by proof beyond a reasonable doubt." *Id.*, 102 S.Ct. at 2363. The Supreme Court continued by finding the principles involved in its

---

[5] Apprendi was decided approximately a month before the OCCA issued its decision resolving Gilson's direct appeal.

35

decision in *Apprendi* did not render invalid prior case law holding that it is not necessary for a jury in a capital case to make every finding of fact underlying the sentencing decision.

> Finally, this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death. *Walton v. Arizona*, 497 U.S. 639, 647-649 (1990); *id.*, at 709-714 (Stevens, J., dissenting). For reasons we have explained the capital cases are not controlling:

> "Neither the cases cited, nor any other case, permits a judge to determine the existence of a factor which makes a crime a capital offense. What the cited cases hold is that, once a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed . . . . The person who is charged with actions that expose him to the death penalty has an absolute entitlement to jury trial on all the elements of the charge." *Almendarez-Torres*, 523 U.S., at 257, n. 2 (Scalia, J., dissenting) (emphasis deleted).

102 S.Ct. at 2366.

Accordingly, we find *Apprendi* does not render invalid the rule of *Cabana*, i.e., that the Eighth Amendment does not require that a jury make the findings required by *Enmund*; an appellate court, a trial judge, or a jury may make the requisite findings. *Cabana*, 474 U.S. at 392, 106 S.Ct. at 700. This Court was legally entitled to make the *Enmund/Tison* findings in [Gilson]'s direct appeal.

Further, under Oklahoma law, in order to return a verdict of guilty, the jury is required to find, beyond a reasonable doubt, each element of the offense charged. In the sentencing phase of a capital case, the jury is required to find, beyond a reasonable doubt, the existence of the aggravating circumstances alleged and whether the aggravating circumstances outweigh the mitigating evidence. This is the basis upon which the death sentence is imposed, not any findings as to culpability

36

which might be required by *Enmund/Tison*. In *Apprendi*, the defendant entered guilty pleas and waived his right to a jury determination of the issues.

For the foregoing reasons, we find *Apprendi* is not controlling, and rehearing on the issue is denied.

Gilson v. State, No. F-98-606 (Okla. Crim. App. Aug. 29, 2000) (Order Denying Rehearing and Directing Issuance of Mandate).

*c. Gilson's entitlement to federal habeas relief on this claim*

Gilson asserts three challenges to the OCCA's decision, which we will proceed to address in turn. First, Gilson argues that, "[b]ased on the verdicts rendered [in his case], there [wa]s no jury finding [that he] actively participated in any criminal acts" sufficient to satisfy the Enmund/Tison standards. Aplt. Br. at 49. In connection with that argument, Gilson, citing the Supreme Court's decision in Apprendi, asserts that he "has a right to a jury determination of his Enmund-Tison death-eligibility." Aplt. Br. at 51. In other words, he appears to be suggesting that the OCCA, in denying his petition for rehearing, unreasonably applied Apprendi. The key question in deciding Gilson's Enmund/Tison claim, in light of the standards outlined in § 2254(d), is whether the OCCA's resolution of that same claim in the context of Gilson's direct appeal was contrary to, or an unreasonable application of, clearly established federal law as it existed at the time of the OCCA's decision (July of 2000). See Stevens v. Ortiz, 465 F.3d 1229, 1235-38 (10th Cir. 2006) (noting that a federal habeas court must identify and apply the clearly established Supreme Court precedent existing at the time the defendant's conviction became final). At that time, Apprendi had just been issued, and there was no clear

37

indication by the Supreme Court that it intended for <u>Apprendi</u> to overrule or undermine the key holdings in <u>Cabana</u>, i.e., that <u>Enmund</u> "establishe[d] no new elements of the crime of murder that must be found by the jury," and that "[t]he decision whether a particular punishment–even the death penalty–is appropriate in any given case is not one that [is] required to be made by a jury," 474 U.S. at 385. Indeed, there has yet to be any such clear indication.[6] Therefore, to allow Gilson to obtain federal habeas corpus relief on the basis of an argument that has yet to be conclusively decided by the Supreme Court, and that was essentially unavailable to the OCCA at the time it decided his direct appeal, is contrary to the dictates of § 2254(d).

In his second challenge to the OCCA's decision, Gilson argues that allowing the OCCA to make <u>Enmund/Tison</u>-related findings would effectively "negate[] the jury's specific findings." Aplt. Br. at 53. In connection therewith, Gilson argues that "[s]ome of his jury believed he did nothing more than 'permit' Coffman to commit the physical abuse," and in doing so "these jurors specifically rejected a finding [that he] even participated with another in the crime." <u>Id.</u> at 49. To properly address this argument, we turn first to the jury instructions that were employed at Gilson's trial to determine what facts the jury necessarily had to have found in reaching its verdict on the first-degree murder charge. The state trial court gave the following instruction outlining the essential

<hr>

[6] Although some of <u>Apprendi</u>'s progeny, in particular <u>Ring v. Arizona</u>, 536 U.S. 584 (2002) (holding that Arizona statute that allowed a trial judge, sitting alone, to determine the presence or absence of aggravating factors in capital case violated the Sixth Amendment right to a jury trial), arguably lend support to Gilson's position, those cases were issued well after Gilson's direct appeal was decided by the OCCA.

elements of the first-degree murder charge:

> No person may be convicted of MURDER IN THE FIRST DEGREE unless the State has proved beyond a reasonable doubt each element of the crime. These elements are: First, the death of a child under the age of eighteen; Second, the death resulted from the willful or malicious injuring, torturing or using of unreasonable force; Third, by the defendant and/or another engaged with the defendant.
> AND IN THE ALTERNATIVE
> No person may be convicted of MURDER IN THE FIRST DEGREE unless the State has proved beyond a reasonable doubt each element of the crime. These elements are: FIRST, the death of a child under the age of eighteen; Second, the death resulted from the willful or malicious injuring, torturing or using of unreasonable force; Third, which was knowingly permitted; FOURTH, by a person responsible for the child's health or welfare.

State ROA - Case No. CF96-245, File #6 at 946 (Instruction No. 6). The state trial court

also gave the following instructions that provided more detail regarding how the jury was

to apply the elements of first-degree murder:

> You are further instructed as to the following Definitions:

> <u>Direct Result</u> - Immediate consequence which is not separated from its initial cause by other, independent factors.

Id. at 947 (Instruction No. 7).

> No person may be convicted of FIRST DEGREE MURDER unless his conduct or the conduct of another person for which he is criminally responsible caused the death of the person allegedly killed. A death is caused by the conduct if the conduct is a substantial factor in bringing about the death and the conduct is dangerous and threatens or destroys life.

Id. at 948 (Instruction No. 8).

> No person may be convicted of MURDER IN THE FIRST DEGREE unless both the fact of the death of the person allegedly killed and the fact that his death was caused by the conduct of another person are established as independent facts and beyond a reasonable doubt. Such proof must

39

consist of evidence which is wholly independent of any confession made by the defendant. Such evidence, however, may be circumstantial and need not include proof of the identity of the person who caused the death.

Id. at 949 (Instruction No. 9).

You are instructed that, although your verdict as to guilt of the crime of FIRST DEGREE MURDER must be unanimous, you need not agree unanimously as to the theory upon which you arrive at that verdict.

Id. at 954 (Instruction No. 14).

You are further instructed as to the following Definitions:

Knowingly - With personal awareness of the facts.

Malicious - The term imports a wish to vex, annoy or injure another person.

Person Responsible for a Child's Welfare - Includes a parent, legal guardian, custodian, foster parent, a person eighteen years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child.

Torture - Infliction of great physical pain.

Unreasonable Force - More than that ordinarily used as a means of discipline.

Willful - Purposeful. "Willful" is a willingness to commit the act or omission referred to, but does not require any intent to violate the law, or to acquire any advantage.

Id. at 958 (Instruction No. 18).

In light of these instructions and the results indicated on the verdict form, it is indisputable that all twelve jurors agreed that the death of Shane Coffman resulted from the willful or malicious injuring, torturing or using of unreasonable force. As noted, however, the jurors were divided on which of the two alternative theories supported the

40

murder conviction. One or more of the jurors found beyond a reasonable doubt that

Gilson "and/or another engaged with" him, i.e, Bertha Coffman, committed the willful or

malicious injuring, torturing or using of unreasonable force. In other words, this group of

jurors found beyond a reasonable doubt that Gilson took an active part, either alone or

together with Bertha Coffman, in the specific acts that directly resulted in Shane

Coffman's death. See generally Webster's Third New Int'l Dictionary 751 (1993)

(defining the term "engage" as "to involve or entangle (as a person) in some affair or

enterprise"); id. (defining the term "engaged" as "involved esp. in a hostile encounter").

The second group of jurors (which, like the first group, would have encompassed

anywhere from one to eleven jurors) found beyond a reasonable doubt that Gilson was a

"person responsible for" Shane Coffman's health or welfare and that Gilson "knowingly

permitted" another person, Bertha Coffman, to commit the specific acts that directly

resulted in Shane Coffman's death. Importantly, nothing about this second group's

findings necessarily meant, as suggested by Gilson, that they "specifically rejected a

finding [that he] even participated with another in the crime." Aplt. Br. at 49. As noted,

the jury instructions required the jury to focus on the specific acts that directly resulted in

Shane Coffman's death. Although the second group of jurors had to have found that

Bertha Coffman, with Gilson's knowing permission, committed those acts, that does not

mean that this group necessarily also found that Gilson played no other role in the

offense. Stated differently, it is entirely possible that this second group of jurors found

that Gilson played an active role in severely abusing Shane Coffman in the hours prior to

his death, but that Bertha Coffman committed the final act or acts that resulted in Shane's death. Indeed, such a finding could have been directly derived from a combination of witnesses' testimony: testimony from the surviving children regarding severe abuse jointly perpetrated by Gilson and Bertha Coffman in the hours leading up to Shane's death, and Bertha Coffman's own testimony that she was in the bathroom alone with Shane just prior to his death and that Gilson entered the bathroom on two occasions during that time period to fix the shower doors.

The next question is whether any of the OCCA's Enmund/Tison culpability findings were inconsistent with the jury's findings. The OCCA found that Gilson "active[ly] participat[ed] in the abuse" of Shane Coffman, Gilson I, 8 P.3d at 920, and in so doing "acted with reckless indifference to human life." Id. at 921. More specifically, the OCCA found that Gilson "participated [in acts] outside the trailer [that] caused injury to the child which elicited screams of pain," "brought [the child] back inside the trailer with swollen arms, a soft spot on his head, and irregular breathing," "carried [the child] to the bathroom," "participated [in acts] inside the bathroom [that] caused the [child] to scream and cry," and "was aware of the struggle between Coffman and the [child] in which the [child] was injured and property in the bathroom was damaged." Id. The OCCA also found that Gilson "subjectively appreciated that his conduct would likely result in the taking of innocent life." Id. In sum, the OCCA found that Gilson's "major participation in the felony of child abuse, combined with reckless indifference to human life, [wa]s sufficient to satisfy the *Enmund* culpability requirement." Id. at 922.

42

We conclude that none of the OCCA's findings were inconsistent with the factual findings that the jury necessarily had to have made in reaching its verdict on the first-degree murder charge. In particular, the OCCA's findings regarding Gilson's active participation in the events leading up to the death of Shane Coffman, and Gilson's reckless indifference to human life, are not inconsistent with or precluded by the findings of those jurors who determined that Gilson knowingly permitted, rather than directly committed, the specific acts that directly resulted in Shane's death. Thus, we reject Gilson's assertion that the OCCA's findings effectively nullified the jury's verdict on the first-degree murder charge.

In his third and final challenge to the OCCA's decision, Gilson argues that "the facts and evidence in his case simply d[id] not support a finding of death eligibility" under Enmund and Tison. Aplt. Br. at 55. More specifically, Gilson takes issue with "[t]he OCCA's finding [that he] was a 'major participant' in the offense and showed 'reckless indifference for human life' . . . ." Id.

On federal habeas review, we must presume the OCCA's factual determinations are correct and such a presumption may only be rebutted by clear and convincing evidence to the contrary. 28 U.S.C. § 2254(e)(1); Willingham v. Mullin, 296 F.3d 917, 922 (10th Cir. 2002). Unless the OCCA's factual determinations are shown to be clearly wrong and objectively unreasonable, we may not overturn them on federal habeas review. Miller-El v. Cockrell, 537 U.S. 322, 324 (2003).

Reviewing the record in light of these standards, we readily reject Gilson's

43

arguments. Although each of the eyewitnesses to the events leading up to the murder (Bertha Coffman and the four surviving children) gave slightly differing accounts, their testimony, particularly when combined with the physical evidence found at the trailer and the results of the autopsy performed on Shane Coffman, was more than sufficient to support each of the OCCA's Enmund/Tison findings. In particular, Tranny Coffman testified that on the day he last saw Shane (i.e., the day of Shane's death), Gilson disciplined Shane inside the trailer by beating him with a board, later that day Gilson accompanied Shane and Bertha Coffman outside the trailer and Shane could be heard screaming, Gilson and Coffman then jointly carried Shane back inside the trailer and placed him on the couch, as Shane sat on the couch, Tranny observed that Shane's arms were swollen, his head had a soft spot on it, and he was breathing in a "weird" fashion (i.e., making gargling-type sounds), Gilson then carried Shane to the bathroom, and at some point thereafter Shane could be heard inside the bathroom. Tranny's testimony was bolstered by that of his brother, Isaac Coffman, who testified that he used the bathroom that day, observed Shane in the bathtub with some of his hair gone, bruises on his arms and legs, making funny noises and failing to respond to questions from Isaac. In addition to this testimony, all five witnesses testified more generally that Gilson routinely "disciplined" the children, including Shane, by beating them with various objects. Considered together, this evidence was more than sufficient to support each of the

44

OCCA's findings regarding Gilson's actions and mental state.[7]

In sum, we conclude that the OCCA's decision was neither contrary to, nor an unreasonable application of, the principles outlined in Enmund and Tison.

*Is Gilson's death sentence disproportionate to his offense?*

In his third issue on appeal, Gilson argues that his death sentence violates the Cruel and Unusual Punishment Clause of the Eighth Amendment because it is disproportionate to his offense. In support of this proposition, Gilson asserts that the "jury did not find he had a direct role in Shane's death," and that his "crime [wa]s one of omission, or failing to act." Aplt. Br. at 58. "Under these circumstances," Gilson argues, "imposition of the death penalty, unique in its severity and irrevocability, is 'excessive in relation to the crime committed' in violation of his constitutional rights." Id. (quoting Coker v. Georgia, 433 U.S. 584, 592 (1977)).

*a) Clearly established Supreme Court precedent*

Our first task is to determine the clearly established federal law applicable to this claim. The Supreme Court, in several cases, including Coker, as well as Enmund and Tison, has outlined general proportionality standards for imposition of the death penalty. Under those standards, "a punishment is 'excessive' and unconstitutional if it (1) makes

---

[7] Although Gilson correctly notes that the OCCA's findings were inconsistent with portions of Bertha Coffman's testimony, that does not render the OCCA's findings improper or unsupported by the evidence. As noted, the OCCA's findings were amply supported by the testimony of Tranny and Isaac Coffman. Moreover, a review of the entire trial transcript strongly suggests that much of Bertha Coffman's testimony was less than truthful.

45

no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime." Coker, 433 U.S. at 592. "A punishment might fail the test on either ground." Id. "Furthermore, these Eighth Amendment judgments should not be, or appear to be, merely the subjective views of individual Justices; judgment should be informed by objective factors to the maximum possible extent." Id. "To this end, attention must be given to the public attitudes concerning a particular sentence history and precedent, legislative attitudes, and the response of juries reflected in their sentencing decisions are to be consulted." Id.

*b) OCCA's application of the proportionality standards*

In connection with its analysis of Gilson's Enmund/Tison arguments on direct appeal, the OCCA addressed and rejected Gilson's proportionality arguments, stating as follows:

> Finally, [Gilson] argues the death penalty is constitutionally disproportionate to the crime of permitting child abuse murder. He contends the death penalty is excessive as: (1) it does not contribute to the goals of punishment and results in needless imposition of pain and suffering, and (2) the punishment is grossly disproportionate to the severity of the crime. See Coker v. Georgia, 433 U.S. 584, 592, 97 S.Ct. 2861, 2866, 53 L.Ed.2d 982 (1977). In discussing the constitutionality of the death sentence for a defendant who did not kill, the Supreme Court in Enmund stated:

> > In Gregg v. Georgia the opinion announcing the judgment observed that "[t]he death penalty is said to serve two principal social purposes: retribution and deterrence of capital crimes by prospective offenders." (citation omitted). Unless the death penalty when applied to those in Enmund's position measurably contributes to one or both of these goals, it "is

46

> nothing more than the purposeless and needless imposition of pain and suffering," and hence an unconstitutional punishment.  Coker v. Georgia, 433 U.S. at 592, 97 S.Ct. at 2866.

Enmund, 458 U.S. at 798, 102 S.Ct. at 3377.

The Supreme Court stated that neither the deterrent nor the retributive purposes of the death penalty were advanced by imposing the death penalty upon Enmund as the Court was unconvinced "that the threat that the death penalty will be imposed for murder will measurably deter one who does not kill and has no intention or purpose that life will be taken."  Id., at 458 U.S. at 798-799, 102 S.Ct. at 3377.  In reaching this conclusion, the Court relied upon the fact that killing only rarely occurred during the course of robberies, and such killing as did occur even more rarely resulted in death sentences if the evidence did not support an inference that the defendant intended to kill.  Id., at 458 U.S. at 799, 102 S.Ct. at 3377-78.

As for the principle of retribution, the Court stated the heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender.

> As for retribution as a justification for executing Enmund, we think this very much depends on the degree of Enmund's culpability-what Enmund's intentions, expectations, and actions were.  American criminal law has long considered a defendant's intention-and therefore his moral guilt-to be critical to "the degree of [his] criminal culpability," (citation omitted), and the Court has found criminal penalties to be unconstitutionally excessive in the absence of intentional wrongdoing.

Id., at 458 U.S. at 800, 102 S.Ct. at 3378,

Enmund was the driver of the "getaway" car in an armed robbery of a dwelling.  The occupants of the house, an elderly couple, resisted and Enmund's accomplices killed them.  The result in Enmund did not turn on the mere fact that Enmund was convicted of felony murder.  It is important to note how attenuated was Enmund's responsibility for the deaths of the victims in that case.

In the present case, [Gilson] was convicted of first degree murder by

47

child abuse by the commission of the child abuse or in the alternative first degree murder by child abuse through the willful permitting of child abuse. 21 O.S.1991, § 701.7(C). We have determined the evidence is sufficient to support either of the alternative ways to commit first degree murder under the statute. The offense of willfully permitting child abuse murder requires a knowing and willful permitting of child abuse to occur by a person authorized to care for the child. Child abuse does not always result in death, but death is the result often enough that the death penalty should be considered as a justifiable deterrent to the felony itself. Children are the most vulnerable citizens in our communities. They are dependent on parents, and others charged in their care, for sustenance, protection, care and guidance. Depending on age and physical development they tend to be more susceptible to physical harm, and even death, if unreasonable force is inflicted upon them. Within this context, legislative action to address the specific crime of child abuse murder is legally justified.

Applying the death penalty to this situation wherein [Gilson], willfully, purposefully and knowingly allowed the victim to be abused to the extent that death resulted, when he was in a position to have prevented that abuse, certainly serves both the deterrent and retributive purposes of the death penalty. The threat that the death penalty will be imposed for permitting child abuse which results in the death of the child accentuates the responsibility a parent or person charged with the care and protection of a child has to that child and will deter one who permits that abuse.

As for retribution, [Gilson]'s personal culpability in this situation is high. The situation is quite different from that where the child abuse occurs and the individual is not aware of the abuse. [Gilson]'s responsibility for the death of the victim was not so attenuated as was that of Enmund who merely waited in the car while the victims were shot and had no knowledge of or immediate control over the actions of his co-defendants. [Gilson]'s personal participation in permitting Coffman to abuse the victim to the extent that death resulted was major and substantial, and there was proof that such participation was wilful [sic] and knowing. Therefore the death penalty is not excessive retribution for his crime.

Accordingly, we find the requirements of Enmund and Tison have been met, and the death penalty is an appropriate punishment for the crime of first degree murder by permitting child abuse in these circumstances. This assignment of error is denied.

Gilson I, 8 P.3d at 922-24 (internal paragraph numbers omitted).

48

*c) Gilson's challenges to the OCCA's proportionality review*

Gilson asserts three general challenges to the OCCA's proportionality review. First, he argues "there is a glaring lack of historical or precedential support for imposing the death penalty" upon him. Aplt. Br. at 62. "Indeed," he argues, "there appears to be no precedent whatsoever for executing a defendant for a crime based on permitting or failing to prevent another's commission of an offense; nor is there precedent for executing a defendant where there is no *actus reus*." Id. "Historically," Gilson argues, "absent a legal duty to act, failure to act to prevent a crime has constituted no offense at all, let alone a capital one." Id. Second, Gilson argues there is "no precedent for imposing death based on a state criminal statute which does not require, and a jury determination which fails to find, the defendant was a participant in the offense." Id. at 64. Third, and finally, Gilson argues that imposition of the death penalty based on an offense of "permitting" makes no measurable contribution to the goals of punishment. In support of this argument, Gilson asserts that "[t]he trial produced no proof [he] committed any acts resulting in harm, nor intended any harm be inflicted (by another), upon the children," and thus "the threat of execution is unlikely to deter the *inaction* required to sustain the conviction." Id. at 67 (italics in original). Relatedly, Gilson asserts that "executing a defendant to avenge a killing he had no intention of committing or causing does not measurably contribute to the retributive end of ensuring the criminal gets his 'just deserts.'" Id. at 68-69.

The problem with Gilson's arguments is that there is a complete disconnect

49

between them and the actual circumstances of his case. For example, while we might

well agree that there is little, if any, historical or contemporary support for imposition of

the death penalty on a defendant who merely fails to act to prevent a crime, and who had

no intention of committing or causing the death of the victim, those are not the

circumstances presented here.[8]  In <u>Tison</u>, the Supreme Court made clear that

proportionality review takes into account not merely the findings necessarily inherent in

the jury's verdict, but also any <u>Enmund/Tison</u> findings subsequently made by the state

trial or appellate courts. The OCCA's <u>Enmund/Tison</u> findings regarding Gilson's active

and significant participation and his reckless indifference to human life effectively

equated Gilson with the two petitioners in <u>Tison</u> and thereby allowed the OCCA to

essentially incorporate <u>Tison</u>'s own proportionality review, including the Court's

conclusion that imposition of the death penalty in such circumstances was proper. Thus,

we are not persuaded that the OCCA's proportionality review was contrary to, or an

unreasonable application of, clearly established federal law.

<em>Ex Post Facto Violation</em>

In his fourth issue, Gilson argues that his first-degree murder conviction rests on

---

[8] There does, however, appear to be relatively substantial support among the states for allowing a defendant to be convicted of first degree murder or felony murder and sentenced to death based upon an underlying felony or act of severe child abuse. <u>E.g.</u>, <u>State v. Velazquez</u>, 166 P.3d 91 (Ariz. 2007); <u>People v. Beames</u>, 153 P.3d 955 (Cal. 2007); <u>Brooks v. State</u>, 918 So.2d 181 (Fla. 2005). Thus, although the Oklahoma Legislature's decision to expressly incorporate child abuse murder into its first-degree murder statute appears to be unique, its decision regarding how to treat and punish such crimes does not appear to be unique.

elements set forth in a statute enacted after Shane Coffman's death, thereby resulting in a violation of the Ex Post Facto Clause. Gilson notes that the jury in his case "was instructed that 'permitting' child abuse could be committed by 'a person responsible for a child's health or welfare' which was the new language of 10 O.S. § 7115, effective 11/1/1995." Aplt. Br. at 71. In turn, he notes, "[a] person responsible for a child's health or welfare was defined for the jury as including an adult 'with whom the child's parent cohabitates or any other adult residing in the home of the child.'" Id. (quoting State ROA, Vol 6. at 637 (Instruction No. 18)). Gilson asserts, however, that at the time of Shane Coffman's death in August 1995, "the statute was codified as 21 O.S. § 843 and defined 'permitting' as a crime committed 'by one under a legal duty to render aid to the child.'" Id. at 71-72.

*a) Clearly established Supreme Court precedent*

Gilson identifies <u>Collins v. Youngblood</u>, 497 U.S. 37 (1990), as providing the "clearly established federal law" applicable to his ex post facto claim. In <u>Collins</u>, the Supreme Court offered the following explanation of the constitutional prohibition against ex post facto laws:

> Although the Latin phrase "ex post facto" literally encompasses any law passed "after the fact," it has long been recognized by this Court that the constitutional prohibition on ex post facto laws applies only to penal statutes which disadvantage the offender affected by them. <u>Calder v. Bull</u>, 3 Dall. 386, 390-392, 1 L.Ed. 648 (1798) (opinion of Chase, J.); <u>id.</u>, at 396 (opinion of Paterson, J.); <u>id.</u>, at 400 (opinion of Iredell, J.). <u>See</u> <u>Miller v. Florida</u>, 482 U.S. 423, 430, 107 S.Ct. 2446, 2451, 96 L.Ed.2d 351 (1987). (footnote omitted). As early opinions in this Court explained, "ex post facto law" was a term of art with an established meaning at the time of the framing of the Constitution. <u>Calder</u>, 3 Dall., at 391 (opinion of Chase, J.);

51

id., at 396 (opinion of Paterson, J.). Justice Chase's now familiar opinion in Calder expounded those legislative Acts which in his view implicated the core concern of the Ex Post Facto Clause:

> "1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a *crime*, or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence*, and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender*." Id., at 390 (emphasis in original).

Early opinions of the Court portrayed this as an exclusive definition of ex post facto laws. (citations omitted). So well accepted were these principles that the Court in Beazell v. Ohio, 269 U.S. 167, 46 S.Ct. 68, 70 L.Ed. 216 (1925), was able to confidently summarize the meaning of the Clause as follows:

> "It is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed, is prohibited as ex post facto." Id., at 169-170, 46 S.Ct., at 68-69.

(citation and footnote omitted)

The Beazell formulation is faithful to our best knowledge of the original understanding of the Ex Post Facto Clause: Legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts. * * *

497 U.S. at 41-43.

Although not cited by Gilson, there is another relevant Supreme Court opinion that

needs to be mentioned.  In May 2000, approximately two months prior to the OCCA's

resolution of Gilson's direct appeal, the Supreme Court issued its decision in <u>Carmell v.

Texas</u>, 529 U.S. 538 (2000).  In <u>Carmell</u>, the Court acknowledged "that <u>Collins</u>[']

[discussion of what constitute[d] an ex post facto law] [wa]s rather cryptic."  <u>Id.</u> at 538.

That is, "[w]hile calling <u>Calder</u>'s four categories the 'exclusive definition' of ex post

facto laws, [<u>Carmell</u>] also call[ed] <u>Beazell</u>'s definition a 'faithful' rendition of the

'original understanding' of the Clause, even though that quotation omitted category four."

<u>Id.</u>  Thus, the Court in <u>Carmell</u> had to clarify that the "fourth category" of ex post facto

laws mentioned in <u>Calder</u> remained valid.  <u>Id.</u> at 539.  And, the Court clarified that this

fourth category was aimed at what it referred to as "sufficiency of the evidence rules" that

"inform us whether the evidence introduced is sufficient to convict as a matter of law

(which is not to say the jury must convict, but only that, as a matter of law, the case may

be submitted to the jury and the jury may convict)."[9]  <u>Id.</u> at 547.

*b) OCCA's rejection of Gilson's ex post facto claim*

Gilson asserted his ex post facto argument on direct appeal.  The OCCA rejected it

on the merits, stating as follows:

> In his third assignment of error, [Gilson] contends his right to be free
> from ex post facto laws was violated as the jury was instructed on the
> elements of child abuse and child abuse murder which were not the law at
> the time of the offense.  The prohibition against ex post facto law requires

---

[9] As an example of a "sufficiency of the evidence rule," the Court cited to the case of Sir John Fenwick, in which Parliament, after Fenwick's purported crime, amended "an act [that, prior to the purported crime,] proclaimed that two witnesses were necessary to convict a person of high treason."  <u>Carmell</u>, 529 U.S. at 526.

the finding of two elements: first, that the law was enacted subsequent to the conduct to which it was being applied; and second, that it must disadvantage the offender affected by it. Allen v. State, 821 P.2d 371, 375-76 (Okl.Cr.1991).

In the present case, [Gilson] was charged with causing the death of Shane on or about August 17, 1995. [Gilson] was also charged with abusing the other Coffman children between July 1995 and February 9, 1996. Prior to November 1995, the first degree murder by child abuse statute, 21 O.S.1991, § 701.7(C) referred to 21 O.S.1991, § 843, for its definition of child abuse. Under § 843, the elements of Permitting Child Abuse were: 1) knowingly, 2) permitting, 3) injury or use of unreasonable force, 4) upon a child under the age of 18, and 5) by one under a legal duty to render aid to the child. Johnson v. State, 751 P.2d 1094, 1096 (Okl.Cr.1988)

In November 1995, § 843 was renumbered as 10 O.S.Supp.1995, § 7115. In 1996, § 7115 was amended and the definition of "permitting" was added to the statute. The elements of "permitting" child abuse are: 1) a person responsible for a child's health or welfare; 2) knowingly; 3) permitted; 4) injury/torture/maiming/(use of unreasonable force); 5) upon a child under the age of eighteen. OUJI-CR (2d) 4-37. The instructions given to the jury in this case referred to permitting and persons responsible for the child's health or welfare and were consistent with OUJI-CR (2d) 4-37.

In the first of his three challenges to the above stated law and instructions, [Gilson] argues the jury was improperly instructed under § 7115, a law that was enacted after the death of the victim and after many of the alleged acts of abuse were committed against the other Coffman children. He contends some of the prosecution's case implied he injured the children prior to November 1, 1995. As stated previously, [Gilson]'s acts of child abuse were one continuous transaction: therefore, while there may have been some evidence of abuse inflicted by [Gilson] prior to November 1, 1995, most of the acts occurred after November 1995, and therefore it was not error to apply § 7115 to [Gilson]'s case. Further, evidence showed that certain injuries to Tia and Isaac were, at the time of discovery in February 1996, relatively recent. That abuse certainly occurred after the enactment of 21 O.S.Supp. 1995, § 7115.

[Gilson] next argues applying the element of a person responsible for a child's health or welfare contained in the 1996 amendment to § 7115 violated ex post facto principles as that element lowered the State's burden

of proof. He asserts that at trial the prosecution merely had to show he was a person responsible for the children's health and welfare, a lesser burden than proving he had a legal duty to render aid as set forth in § 843.

The jury in this case was instructed in part as follows:

> No person may be convicted of permitting the beating or injuring of a child unless the State has proved beyond a reasonable doubt each element of the crime. These elements are: FIRST, a person responsible for a child's health or welfare; SECOND, knowingly; THIRD, permitted; FOURTH, injury, torture, or use of unreasonable force; FIFTH, upon a child under the age of eighteen.

OUJI-CR (2d) 4-37. The list of definitions given to the jury included the following:

> Person responsible for a child's welfare-includes a parent, legal guardian, custodian, foster parent, a person eighteen years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child.

This language is consistent with 21 O.S.Supp.1992, § 845(B)(4) renumbered as 10 O.S.Supp.1995, § 7102(B)(4). See also OUJI-CR (2d) 4-39.

Under the renumbered 21 O.S.1991, § 843, the element of "by one under a legal duty to render aid to the child" was defined in the uniform jury instructions as follows:

> A person is under a legal duty to render aid to a child if [a statute imposes a duty to render aid to the child] [a (parent-child) (husband-wife) relationship exists between that person and the child] [a contractual duty to render aid to the child has been assumed by that person] [that person has voluntarily assumed the care of the child].

OUJI-CR (1st) 424.

Under 21 O.S.1991, § 843, in order to prove a legal duty to render aid, the prosecution had to prove a relationship between the defendant and the victim, either parent-child, husband-wife or a contractual duty to render aid

to the child has been assumed by that person or that the defendant had voluntarily assumed the care of the child.  Under 10 O.S.Supp.1995, § 7115, in order to support a finding that the defendant was responsible for the child's welfare, the prosecution had to prove a certain relationship between the defendant and the child, either that of parent, legal guardian, custodian, foster parent, a person eighteen years of age or older with whom the child's parent cohabitates or any other adult residing in the home of the child.  Proving any of the alternatives in § 7115 is not any lesser of a burden than proving the minimum requirement under § 843 that the defendant had voluntarily assumed the care of the child.

Further, the evidence in this case clearly showed [Gilson] had a parent-child relationship with the children.  [Gilson] stated he shared equal responsibility with Coffman in disciplining and parenting the children.  He said he and Coffman wanted to be a family and provide the children with two parents.  In statements concerning his disciplining of the children, he often stated "that's part of being parents."  Coffman also stated she had given [Gilson] authority to discipline the children and that she, the children and [Gilson] were all trying to be a family.  Under this evidence, the State proved the parent-child relationship as set forth in both §§ 843 and 7115.  Any differences in the definitions of by one under a legal duty to render aid to the child and person responsible for a child's welfare did not disadvantage [Gilson], deprive him of an available defense, nor change the facts necessary to establish guilt.  Therefore, no ex post facto violation occurred.

Gilson I, 8 P.3d at 914-16 (internal paragraph numbers omitted).

*c) Gilson's challenge to the OCCA's ex post facto analysis*

Gilson asserts four general challenges to the OCCA's ex post facto analysis, which we proceed to address in turn.  First, Gilson contends that "the OCCA denied relief based on a continuous transaction theory pertinent only to the injury-to-child charges" and "the result was that the evidence of one type of crime (injury to child) was used to support a conviction for another (murder)."  Aplt. Br. at 74.  In other words, Gilson argues, "the effect [wa]s to punish [him] with the death penalty for his crimes against the other

56

children who did not die." Id. Although Gilson is correct that the OCCA utilized a "continuous transaction" theory, it is clear from the OCCA's opinion that that rationale was intended to apply solely to the injury to child charges, and not to the first-degree murder charge. Indeed, it would have been unnecessary for the OCCA to analyze Gilson's remaining ex post facto arguments had it concluded that the continuous transaction theory allowed the newer statute to be properly applied to the first-degree murder charge. Moreover, there is simply no support for Gilson's bald assertion that "evidence of one type of crime (injury to child) was used to support a conviction for another (murder)." Our review of the trial transcript firmly establishes that the first-degree murder charge was based on specific and substantial evidence regarding the chain of events on the day of Shane's death.

In his second challenge to the OCCA's decision, Gilson asserts that, contrary to the conclusion reached by the OCCA, "[t]here is a substantial difference between having to prove a legal duty to a child and merely proving that the person cohabitates with the parent of the child." Aplt. Br. at 75. Gilson further asserts that the newer statute that was applied in his case effectively "widened the net of those who could be defined as 'permitting' such child abuse" because "proving mere cohabitation is a lesser burden than proving a legal duty . . . ." Id. at 76. In addition, he asserts, citing Calder's fourth category of ex post facto laws, that it "'alter[ed] the legal rules of evidence" and required the receipt of "'less, or different, testimony, than the law required at the time of the commission of the offense, in order to convict the offender.'" Id. (quoting Calder, 3 Dall.

at 390). In short, he asserts that "the OCCA missed the point that the change of statute included [him] when the jury might well not have found him liable for murder under the earlier language . . . ." Id.

Although Gilson may well be correct in asserting that the newer statute effectively "widened the net of those who could be" held responsible for permitting child abuse (i.e., by encompassing individuals who, under the older statute, did not owe a "legal duty" to the child victim), the important point is that, as concluded by the OCCA and as amply supported by the evidence presented at trial, Gilson was responsible under both the older and the newer statutes, and thus the application of the newer statute to his case, although procedurally incorrect, did not result in an ex post facto violation.[10] More specifically, the State's evidence, which we outline in greater detail below, firmly established that Gilson had voluntarily assumed the care of the Coffman children, and thus under the older statute would have had a legal duty to render aid to Shane Coffman. In sum, then, we conclude that Gilson had fair warning, at the time of Shane's death, that his conduct was illegal, and thus there was no ex post facto violation. See Miller v. Florida, 482 U.S. 423, 429-30 (1987) (noting that the Ex Post Facto Clause restrains legislatures from enacting "arbitrary or vindictive" laws, and ensures that individuals are given "fair warning" of a law's effect).

---

[10] To the extent Gilson takes issue with the OCCA's interpretation of the two statutes, we are bound by the OCCA's interpretation. Parker v. Scott, 394 F.3d 1302, 1319 (10th Cir. 2005) (noting that state court interpretations of state law are binding on this court in habeas proceedings).

As for Gilson's reliance on <u>Calder</u>'s fourth category of ex post facto laws, there are two problems with it. First, the newer statute that was applied in Gilson's case does not fall within <u>Calder</u>'s fourth category. In particular, the newer statute, which (like the older statute) simply outlines the elements of the crime of permitting child abuse, is not a "sufficiency of the evidence rule" in that it does not "inform us whether the evidence introduced is sufficient to convict as a matter of law . . . ." <u>Carmell</u>, 529 U.S. at 547. Second, even assuming to the contrary, we conclude, for the reasons already stated, that Gilson was not harmed by the application of the newer statute. In other words, even if the newer statute falls within <u>Calder</u>'s fourth category and there was a technical ex post facto violation, we conclude beyond a reasonable doubt that Gilson was not prejudiced by it because the State's evidence was sufficient to establish his guilt under both the older and the newer statute.

In his third challenge to the OCCA's decision, Gilson contends that he "had no authority to permit or to withhold permission from [Bertha] Coffman because, under the . . . language of the [older] statute, he had no legal duty." Aplt. Br. at 80. More specifically, Gilson argues that "the mere fact of cohabitation did not . . . confer such a legal duty and thus did not confer the prerequisite authority." <u>Id.</u> at 80-81. As a result, Gilson argues, "[t]he defense that he could not have permitted this child abuse was thus taken from him by the trial court's actions in giving the instructions predicated on laws amended to [his] disadvantage after Shane's death, in violation of the Ex Post Facto clause . . . ." <u>Id.</u> at 81.

These arguments are easily rejected. As the OCCA essentially found, and as we have previously noted, the evidence presented by the State at trial overwhelmingly established that Gilson voluntarily assumed a duty of care towards the Coffman children. Shortly after Gilson and Bertha Coffman entered into a relationship with one another in the fall of 1994 (well before they began living together), Gilson began assisting Coffman in the care and discipline of her children. In July 1995, Gilson invited Coffman and her children to begin living with him at his trailer. Thereafter, Gilson and Coffman jointly engaged in the care and discipline of the children. For example, Gilson established the rules regarding where the children could sleep (only in the living room), which rooms they could physically be in inside the trailer (they were prohibited from going in either of the two bedrooms), when and what they could eat, and prohibited them from attending school or church, or from playing outside the trailer. Gilson also regularly disciplined each of the Coffman children by way of long periods of standing at a wall, beatings, placement in the bathroom, and deprivation of food and contact with the other children. Lastly, during his interviews with law enforcement officials, Gilson admitted that he and Coffman were "plan[ning] on bein[g] husband and wife and [were] formin[g] a family and gettin[g] some of the basics down," State ROA, State's Exhibit 01 at 29, that the two of them shared equal responsibility for parenting the children, and that both were involved in disciplining the children. Id. at 37 ("Yeah, that's part of being parents.").

In his fourth and final challenge to the OCCA's decision, Gilson contends that application of the newer statute in his case deprived him of the defense that he lacked

60

authority to permit or to withhold permission from Bertha Coffman. We summarily reject this contention for the reasons we have already discussed.

*Trial court's refusal to provide instructions re lesser included offenses*

In his fifth issue on appeal, Gilson contends that his "Eighth and Fourteenth Amendment rights were violated" as a result of "the trial judge's refusal to instruct his jury on the lesser included offenses of second degree depraved mind murder, and on second degree manslaughter." Aplt. Br. at 84-85. The facts relevant to this contention are as follows. At the conclusion of the first-stage evidence, Gilson requested that the trial court instruct the jury on what Gilson asserted were the lesser included offenses of murder in the second degree and second degree manslaughter. Tr., Vol. X at 2103. The trial court rejected Gilson's requests. In doing so, the trial court concluded that, with respect to Gilson's request for an instruction on murder in the second degree, "there [wa]s no[t] sufficient evidence to establish an element of depraved mind and conduct . . . ." Id. With respect to Gilson's request for an instruction on manslaughter, the trial court concluded "there [wa]s no evidence of possible negligent conduct. If the State's evidence is believed, the acts described are intentional acts which the jury could find occurred and caused the death of Shane Coffman and, if so, were intentional acts, knowingly done or permitted by the defendant." Id. As a result of the trial court's ruling, the jury was instructed solely on the charge of first degree murder under the two alternative theories alleged by the State, and the jury ultimately returned a verdict of guilty on that charge.

61

*a) Clearly established Supreme Court precedent*

Gilson identifies Beck v. Alabama, 447 U.S. 625 (1980), as providing the "clearly established federal law" applicable to this claim. In Beck, the Supreme Court held "that the death penalty may not [constitutionally] be imposed under . . . circumstances" where "the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict . . . ." 447 U.S. at 627. The Court explained that "when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense – but leaves some doubt with respect to an element that would justify conviction of a capital offense – the failure to give the jury the 'third option' of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction." Id. at 637. "Such a risk," the Court stated, "cannot be tolerated in a case in which the defendant's life is at stake." Id.

To succeed on a claim under Beck, a state capital defendant seeking federal habeas relief "must show that the evidence presented at trial would permit a rational jury to find him guilty of the lesser included offense and acquit him of first-degree murder." Young v. Sirmons, 486 F.3d 655, 670 (10th Cir. 2007) (citing Hogan v. Gibson, 197 F.3d 1297, 1307 (10th Cir. 1999)). As noted by the dissent, "this Court has n[ever] decided whether a question concerning the sufficiency of the evidence to support the giving of a lesser included offense instruction is a matter of law or fact, and therefore reviewable under § 2254(d)(1) or § 2254(d)(2)." Boltz v. Mullin, 415 F.3d 1215, 1233 (10th Cir. 2005). Although it is by no means outcome-determinative in this case, we agree with the dissent

62

that it is a mixed question of law and fact and is thus reviewable under § 2254(d)(1). See,

e.g., Samu v. Elo, 14 Fed. Appx. 477, 478 (6th Cir. 2001) (reviewing question under §

2254(d)(1)); United States v. Abeyta, 27 F.3d 470, 473 (10th Cir. 1994) (treating trial

court's decision not to give a lesser included offense instruction as a mixed question of

law and fact). More specifically, we conclude that a state court's determination of

whether the evidence presented at trial was sufficient under the Beck standard to justify a

lesser-included instruction is not a finding of historical fact, but rather a legal

determination reached after assessing a body of evidence in light of the elements of the

alleged lesser-included offense.

Under Oklahoma law, "all lesser forms of homicide are considered lesser included

offenses of first degree murder." Id. (citing Shrum v. State, 991 P.2d 1032, 1036 (Okla.

Crim. App. 1999)). Thus, both of the offenses cited by Gilson, i.e., second-degree murder

and second-degree manslaughter, were and are considered lesser-included offenses of

first-degree murder.

b) OCCA's rejection of Gilson's Beck claim

Gilson asserted his Beck claim on direct appeal. The OCCA rejected it on the

merits:

> In his ninth assignment of error, [Gilson] contends the trial court erred in
> failing to instruct the jury on the lesser included offenses of second degree
> murder and second degree manslaughter. The trial court denied [Gilson]'s
> requested instructions finding "no sufficient evidence to establish an
> element of depraved mind and conduct" to support second degree murder
> and "no evidence of possible negligent conduct" to support second degree
> manslaughter.

63

In a criminal prosecution, the trial court has the duty to correctly instruct the jury on the salient features of the law raised by the evidence without a request by the defendant. (citations omitted). This means that all lesser forms of homicide are necessarily included and instructions on lesser forms of homicide should be administered if they are supported by the evidence. (citation and footnote omitted). In determining the sufficiency of the evidence to support a lesser offense we look at whether the evidence might allow a jury to acquit the defendant of the greater offense and convict him of the lesser. See Hogan v. Gibson, 197 F.3d 1297, 1305 (10th Cir. 1999) citing Beck v. Alabama, 447 U.S. 625, 636, 100 S.Ct. 2382, 2388, 65 L.Ed.2d 392 (1980). Only if there is evidence which tends to negate an element of the greater offense, which would reduce the charge, should instructions on a lesser included offense be given. See Fairchild [v. State], 998 P.2d [611,] 627 [(Okla. Crim. App. 1999)]. See also United States v. Scalf, 708 F.2d 1540, 1546 (10th Cir. 1983) ("a lesser included offense instruction should not be given unless there is evidence to support a finding that the lesser offense was committed while the greater offense was not.").

Murder in the second degree occurs "when perpetrated by an act imminently dangerous to another person and evincing a depraved mind, regardless of human life, although without any premeditated design to effect the death of any particular individual." 21 O.S.1991, § 701.8(1). [Gilson] argues, and the State concedes, that when an individual wilfully [sic] or maliciously injures, tortures, or uses unreasonable force on a child there can be no question but that the individual is acting with a depraved mind. [Gilson] and the State also agree that in addition, committing the abuse which results in the death of a child, but without the intent to kill, is imminently dangerous conduct. However, as the State points out, these elements do not negate the element that the victim was a child.

By enacting 21 O.S.1991, § 701.7(C), the Legislature clearly intended to make a homicide occurring during the commission of or the permitting of child abuse to be first degree murder. Drew, 771 P.2d at 228. Where child abuse committed in violation of 21 O.S.1991, § 7115, results in the death of the child, the specific homicide provision of 21 O.S.1991, § 701.7(C), should be used. Fairchild, 998 P.2d at 627. Here, the victim was clearly a child, and [Gilson] has not shown that the greater offense of first degree murder was not committed. Therefore, the evidence did not support an instruction on second degree depraved mind murder.

Further, [Gilson] was not entitled to an instruction on second degree depraved mind murder as he has failed to show that under the evidence

presented at trial, a rational jury would acquit him of first degree murder and find him guilty of the lesser offense of second degree murder. [Gilson] is entitled to an instruction on second degree murder only if the evidence at trial would allow a jury to rationally conclude that his conduct was not done with the intention of taking the life of an individual. 21 O.S.1991, § 701.8(1).

Here the evidence showed that [Gilson] either willfully and intentionally participated in the abuse of Shane or that he knowingly permitted Coffman to abuse Shane to the extent that death resulted. The Coffman children testified [Gilson] acted with Coffman in each instance of abuse inflicted on Shane the day he died. Coffman testified she disciplined Shane that day and that [Gilson] stayed in the other room, except for the two times he attended to the shower doors and the time she saw him exit the bathroom shortly before the victim was found not breathing. In his pre-trial statement, [Gilson] said all he did was spank Shane and put him in the bathtub. This evidence would lead a reasonable jury to conclude that either [Gilson] willfully and intentionally inflicted such abuse to the extent that Shane died as a result or that he did nothing at all. The evidence does not support a finding that [Gilson] merely acted with a depraved mind having no intention of taking the victim's life.

As for the offense of second degree manslaughter, to warrant such an instruction evidence must be presented at trial showing the defendant's culpable negligence. [citation omitted]. The evidence here did not show a degree of carelessness amounting to a culpable disregard of the rights and safety of others to warrant an instruction on second degree manslaughter. [citation omitted]. Evidence of [Gilson]'s active participation in the abuse of the victim would not lead a rational jury to acquit him of first degree murder and convict him of second degree manslaughter.

Further, this Court has held that a defendant is not entitled to instructions on any lesser included offense when he defends against the charge by proclaiming his innocence. Hooker v. State, 887 P.2d 1351, 1361 (Okl.Cr.1994), cert. denied, 516 U.S. 858, 116 S.Ct. 164, 133 L.Ed.2d 106 (1995); Snow v. State, 876 P.2d 291, 297 (Okl.Cr.1994), cert. denied, 513 U.S. 1179, 115 S.Ct. 1165, 130 L.Ed.2d 1120 (1995). [Gilson]'s defense was that he did not commit nor did he know of any abuse to any of the children. He claimed he was asleep on the sofa while Coffman was in the bathroom with Shane. He confessed that his only bad act was hiding the body and lying about Shane's death. Here, the evidence showed either [Gilson]'s wilful [sic] and malicious infliction of or his permitting the

65

infliction of child abuse or it showed he knew nothing about the abuse. Therefore, instructions on second degree murder and second degree manslaughter were not warranted. Accordingly, the trial court did not abuse its discretion in denying the requested instructions. This assignment of error is denied.

Gilson I, 8 P.3d at 917-18 (internal paragraph numbers omitted).

*c) Gilson's challenge to the OCCA's analysis*

Gilson challenges each of the three rationales offered by the OCCA in rejecting his claim that he was entitled to an instruction on second degree murder. As outlined in greater detail below, we conclude that the final two rationales offered by the OCCA are, indeed, suspect, but that the initial rationale, standing alone, represents a reasonable application of Beck. See 28 U.S.C. § 2254(d)(1). We also conclude that the OCCA reasonably applied Beck in rejecting Gilson's claim that he was entitled to a jury instruction on the lesser included offense of second degree manslaughter. Id.

The first rationale offered by the OCCA for rejecting Gilson's request for an instruction on second degree murder was that, even assuming the evidence presented at trial would have allowed a jury to reasonably find the existence of all the elements of second degree murder, the uncontroverted fact that the victim in the case was a child effectively required Gilson to be convicted of first degree murder rather than second degree murder. More specifically, the OCCA noted that the Oklahoma Legislature "clearly intended to make a homicide occurring during the commission of or the permitting of child abuse to be first degree murder." Gilson I, 8 P.3d at 917.

The only challenge Gilson now asserts to this rationale is that "'the inability to

66

negate the element that' the victim was a child should not have barred the inclusion of the jury instruction [on second degree murder], because the party proving the case, the State, conceded the evidence at trial was more than sufficient to support the giving of [such] an instruction . . . ." Aplt. Br. at 87-88. This challenge, however, is easily rejected. To begin with, Gilson cites to no cases, and we have found none, that would have bound the OCCA to the State's purported concession as to the sufficiency of the evidence. More importantly, it is apparent that the OCCA's conclusion hinged not on its view of the evidence presented at trial, but instead on its legal conclusion that, under Oklahoma's statutory scheme, an individual guilty of the second degree murder of a child was effectively responsible for having committed, and thus was required to be convicted of, first degree child abuse murder. Stated in terms of Beck, the OCCA effectively concluded, and reasonably so in our view, that Gilson was not entitled to an instruction on second degree murder because, under Oklahoma's statutory scheme, a jury could not rationally have acquitted Gilson of first degree child abuse murder and convicted him of second degree murder.

The OCCA's second rationale for affirming the state trial court's decision to reject Gilson's request for a second degree murder instruction was that, in its view, the "evidence would lead a reasonable jury to conclude that either [Gilson] willfully and intentionally inflicted such abuse to the extent that Shane died as a result or that he did nothing at all." Gilson I, 8 P.3d at 918. Gilson argues that this represents "an unreasonable interpretation of the facts in evidence." Aplt. Br. at 89. In particular,

67

Gilson contends "the statement is belied by the jury's divided verdict," and "is simply contrary to the evidence presented which, considered as a whole, could support a finding [he] acted with a depraved mind having no intention of taking the victim's life." Id.

This is an extremely close question. Although the evidence presented at trial clearly establishes that Gilson was intimately involved in, if not primarily responsible for, the extreme abuse inflicted on Shane prior to his death, a rational jury perhaps could have found that Gilson acted not with the intent to kill Shane, but rather with a depraved mind and without the intention of taking Shane's life. Even assuming this is true, however, the OCCA's initial rationale still holds true, i.e., the jury would have been required under Oklahoma's statutory scheme to find Gilson guilty of first degree child abuse murder rather than second degree murder. Thus, it is unnecessary for us to ultimately decide whether the OCCA's second rationale passes muster under the AEDPA standards.

The final rationale offered by the OCCA for rejecting Gilson's claim that he was entitled to an instruction on second degree murder, i.e., that Gilson was not entitled to instructions on any lesser included offenses because he defended against the first-degree murder charge by proclaiming his innocence, has previously been rejected by this court as inconsistent with Beck. See Hooker v. Mullin, 293 F.3d 1232, 1238 (10th Cir. 2002); Mitchell v. Gibson, 262 F.3d 1036, 1049-50 (10th Cir. 2001). Thus, it must likewise be rejected in this case. As we have noted, however, the OCCA's first rationale is sufficient, standing alone, to render reasonable the OCCA's rejection of Gilson's claim that, under Beck, he was entitled to an instruction on second degree murder.

68

That leaves only Gilson's challenge to the OCCA's conclusion that he was not entitled to a jury instruction on the lesser included offense of second degree manslaughter. The OCCA's conclusion on this issue rested primarily on the rationale that "[e]vidence of [Gilson]'s active participation in the abuse of the victim would not lead a rational jury to acquit him of first degree murder and convict him of second degree manslaughter."[11] Gilson I, 8 P.3d at 918. Gilson's only challenge to this rationale is that the jury could have found him guilty of second degree manslaughter "if [Bertha] Coffman were believed . . . ." Aplt. Br. at 93. More specifically, Gilson argues that "[r]easonable jurors could have concluded that evidence of [his] failure to intervene initially when Coffman began the physical abuse of Shane showed he was careless in that he did not exercise ordinary care and caution." Id. at 98. In other words, Gilson argues that, "[b]ased on the evidence and testimony, reasonable jurors may have concluded [he] was careless in his failure to intervene to prevent the abuse as it occurred." Id. at 99.

Gilson's arguments notwithstanding, we conclude the OCCA's rationale was neither contrary to, nor an unreasonable application of, Beck. Although it is true that Bertha Coffman testified at trial and attempted to downplay Gilson's involvement in the death of Shane, her testimony was riddled with internal inconsistencies[12], was contrary to

---

[11] The OCCA also offered the alternative rationale that Gilson was not entitled to instructions on second degree manslaughter because he defended against the first-degree murder charge by proclaiming his innocence. As noted, this rationale has previously been rejected by this court as inconsistent with Beck.

[12] For example, Coffman's statements regarding the types of abuse inflicted by Gilson on Shane varied dramatically. Throughout most of her post-arrest interviews,

69

virtually all of the other witnesses' testimony, and was likewise contrary to the physical evidence presented by the State. The overwhelming weight of the State's evidence, which we recounted in detail in addressing Gilson's Enmund/Tison claim, established that Gilson was not merely negligent, but rather was intimately involved in the abuse of Shane and, at a minimum, acted with the intent of causing him physical harm.[13] See Ball v. State, 173 P.3d 81, 91 (Okla. Crim. App. 2007) (noting that "ordinary negligence resulting in death is sufficient to warrant a conviction for second-degree manslaughter . . . ."). Thus, reviewing the OCCA's determination under the deferential standard outlined in

---

Coffman was clearly protective of Gilson, generally denying that he did anything more than spank or correct her children. Her general denials were belied, however, by her admission to investigators that Gilson had an explosive temper, that there had "been so much punishment in [Gilson's] house," 2/12/1996 Coffman Interview Tr. at 31, that her children were afraid of Gilson's "punishments," id. at 181, and that her children talked about Gilson "doing most of his bustings with force." Id. at 184. Her general denials were also belied by her admission during her second post-arrest interview that Gilson had "whipped" Shane "a couple of days" before Shane's death. Id. at 147. At trial, Coffman, having been separated from Gilson for over two years, acknowledged that Gilson had, in fact, severely abused all of her children. Moreover, Coffman admitted observing Gilson use a board to hit Shane on the top of his head, his shoulders, his chest, and his legs. She also testified that Gilson was the last person alone with Shane in the bathroom prior to his death, and that she was awakened by a loud sound from the bathroom during that time.

[13] As we have already noted, the OCCA, in making its Enmund/Tison findings, specifically found that Gilson "was a major participant in the felony" because, "[a]cting jointly with Coffman, he took Shane outside the trailer and was party to conduct which elicited screams from the child," and also, together with Coffman, "took Shane back inside the trailer . . . to the bathroom and . . . remained with him in the bathroom for periods of time." Gilson I, 8 P.3d at 920. In turn, we have concluded that those findings were amply supported by the evidence presented at trial. Although the dissent suggests that the jury could rationally have found that Gilson "played no part in abusing Shane the day he died," Dissent at 3, any such conclusion would be contrary to both the OCCA's Enmund/Tison findings and our affirmance of those findings.

70

§ 2254(d)(1), we conclude the OCCA reasonably determined that a rational jury could not have convicted Gilson of second degree manslaughter and acquitted him of first degree child abuse murder. In turn, we conclude the OCCA reasonably applied Beck in determining that Gilson was not entitled to an instruction on second degree manslaughter.

The dissent argues that a rational jury, relying on Bertha Coffman's trial testimony and, apparently, Gilson's post-arrest statements to police, could have found that "Gilson played no part in abusing Shane the day he died and that he [Gilson] was asleep on the couch during the abuse that led to Shane's death." Dissent at 3. There are at least three significant flaws in this reasoning. First, the dissent's analysis affords virtually no deference to the OCCA's assessment of the evidence presented at trial. Rather than examining the evidence presented at trial with an eye toward determining whether the OCCA's determination was reasonable, the dissent appears to review the evidence presented as if this were a direct appeal, and ultimately substitutes its own judgment for that of the OCCA.

The second major flaw in the dissent's reasoning is that the testimony of Bertha Coffman does not even remotely begin to account for either the serious injuries sustained by Shane or the cause of his death. According to Coffman's testimony, her physical contact with Shane on the day of his death was limited to spanking or swatting him approximately fifteen times on his bottom and the back of his legs, carrying him to the bathtub, and pressing on his shoulders to force him to sit back down in the tub when he attempted to stand up. Coffman also testified that at one point Shane slipped and fell in

71

the bathtub and hit his head or face on the bathtub faucet. Even assuming the worst, none of these events could have allowed the jury to make any rational findings regarding how Shane sustained the multiple acute fractures found by the medical examiner[14] or, more importantly, how he died.[15]

Lastly, even assuming, arguendo, that the jury could rationally have found that Gilson was asleep on the couch while Coffman abused and ultimately killed Shane, then Gilson would have been entitled to an acquittal, not a conviction of second-degree

---

[14] Dr. Larry Balding, the deputy medical examiner who examined Shane's remains, testified that he found evidence of acute fractures throughout Shane's body. To begin with, Balding testified there was a fracture to Shane's jaw, and a fracture separation of the zygoma on the right side of the skull (i.e., the cheek bone). Tr. at 1943. Balding opined that these two fractures were caused by separate blows because they were on opposite sides of the head, id. at 1944-46, and that it would have taken a great deal of force to cause the jaw fracture. Id. at 1946. Balding further testified that he found a "localized complex fracturing involving the left clavicle or collarbone," id. at 1948, fractures of "the left ribs, first, second and third ribs," id., and a fracture of the right shoulder blade, id. at 1950-51. Balding testified he found a left distal tibial metaphyseal fracture, which would have been consistent with some form of blunt force or a severe twisting of the ankle. Id. at 1952. Lastly, Balding testified that there were fractures of the spinal processes (the bony protrusions) of the C-7 vertebrae (i.e., the lower-most neck vertebrae), T-2, T-3, T-4, and T-10. Id. at 1953-54.

[15] Contrast this with Ball, the recent OCCA case cited by the dissent in alleged support of its position. The defendant therein, Carlis Anthony Ball, was charged with and convicted of first-degree child abuse murder in the scalding death of his two-year-old son. On appeal, Ball argued that the trial court erred in refusing his request for instructions on the lesser-included offense of second-degree manslaughter. The OCCA agreed, noting that Ball had described an "accidental spill injury . . . in his 911 call and subsequent statements" to responding firefighters, 170 P.3d at at 86, and that these "statements about his handling of the boiling water were sufficient as a matter of law to support an inference of culpable negligence." Id. at 91. Unlike the situation here, the evidence cited by Ball provided an alternate explanation for how his young son was scalded and ultimately died. Neither Bertha Coffman's testimony nor Gilson's post-arrest statements provided an explanation of how or why Shane died.

72

manslaughter. That is, Gilson's conduct would not have risen even to the level of culpable negligence necessary to be convicted of second-degree manslaughter. Indeed, Gilson's trial counsel argued this same factual theory (i.e., Gilson being asleep during the abuse and death) to the jury at the close of the first-stage proceedings and the jury rejected it. Dissent at 9 (discussing first-stage closing arguments of defense counsel).

*Trial court's refusal to allow testimony from defense expert witness*

In his sixth issue, Gilson argues that the state trial court's refusal to allow his expert witness, Dr. Wanda Draper, to testify regarding the credibility of the Coffman children's testimony violated his constitutional rights. We begin our analysis of this issue by reviewing the key events that culminated in the state trial court's ruling.

On April 2, 1998, the state trial court, at Gilson's request, conducted an in camera hearing regarding the competency of the surviving Coffman children to testify during the State's case-in-chief. Tr. Vol. IV at 840. During that hearing, Gilson presented the testimony of Dr. Wanda Draper, who holds a Ph.D in child development and was a professor in the Department of Psychiatry and Behavioral Sciences in the College of Medicine at the University of Oklahoma. Draper indicated that she had concerns about the competency of the Coffman children to testify. Id. at 855. To begin with, Draper noted that the children "for a period of months were living under the assumption [created by their mother and Gilson] that one of their brothers [Shane] had run away, but the assumption was that he was still alive. And then that changed and they discovered that he [wa]s not alive." Id. Draper questioned whether the children could "appreciate the

73

obligation to tell the truth when their own mother lied to them . . . ." Id. at 859. Draper also noted that "[t]he stories between and among the children ha[d] changed," id. at 862, and she opined that the "children ha[d] had enough trauma in their lives that it would be very difficult for them over time to recall accurately what actually happened." Id. at 863. At the conclusion of Draper's testimony, Gilson's counsel moved to suppress the testimony of the Coffman children based on their lack of competence to accurately testify about events relevant to the case. Id. at 890. The state trial court overruled that motion, but reserved a final ruling on each of the children's competency to testify until it had heard their individual voir dire examinations. Id. at 895. With respect to the testimony of Dr. Draper, the state trial court concluded it "d[id] not meet the Daubert standards to qualify as expert direct testimony regarding credibility," and that "credibility . . . [wa]s a matter for the finder of fact." Id.

On April 7, 1998, during the course of the prosecution's case-in-chief, the state trial court conducted voir dire proceedings to determine the competency of each of the children to testify. At the conclusion thereof, the state trial court determined that all of the children were competent to testify. Id. Vol. VII at 1540. The State proceeded to introduce the testimony of each of the children, and Gilson's trial counsel was allowed to cross-examine each child. During his own case-in-chief, Gilson renewed his request to present the testimony of Dr. Draper regarding the credibility of the Coffman children's testimony. The state trial court denied that request.

*a) Clearly established Supreme Court precedent*

Gilson identifies <u>Davis v. Alaska</u>, 415 U.S. 308 (1974), and <u>Chambers v. Mississippi</u>, 410 U.S. 284 (1973), as providing the "clearly established federal law" applicable to this claim. In <u>Davis</u>, the Supreme Court emphasized the importance of allowing a criminal defendant to adequately cross-examine prosecution witnesses. In particular, the Court noted "that the exposure of a [prosecution] witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." 415 U.S. at 316-17. Such cross-examination, the Court noted, would be "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." <u>Id.</u> at 316. If this right is violated, the Court held, "no amount of showing of want of prejudice would cure it." <u>Id.</u> at 318 (internal quotation marks omitted).

In <u>Chambers</u>, the defendant in a Mississippi state criminal proceeding sought to introduce reliable evidence that a prosecution witness had, orally and through a written confession (that was later recanted), admitted being guilty of the murder offense that Chambers was charged with. The state trial court refused to allow Chambers to cross-examine the witness on credibility. Although the Mississippi Supreme Court affirmed the conviction, the Supreme Court granted Chambers' petition for writ of certiorari and reversed. In doing so, the Court noted that "[t]he right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." <u>Chambers</u>, 410 U.S. at 294. "Few rights," the Court held, "are

75

more fundamental than that of an accused to present witnesses in his own defense." Id. at 302. "In the exercise of this right," the Court held, "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Id.

### b) OCCA's rejection of Gilson's claim

In his direct appeal, Gilson challenged the state trial court's refusal to admit the testimony of Dr. Draper, arguing that the state trial court's ruling was unreasonable and violated his constitutional rights. The OCCA did not address Gilson's latter argument, and instead simply affirmed the state trial court's evidentiary ruling:

> [Gilson] . . . argues the trial court erred in excluding the trial testimony of Dr. Draper. After hearing in-camera testimony from Dr. Draper, the trial court found the testimony "does not meet the Daubert standards to qualify as expert direct testimony regarding credibility. The credibility, again, is a matter for the finder of fact." The trial court did allow the defense the opportunity to have Dr. Draper serve as "expert advisory counsel" and remain in the courtroom during the children's testimony to advise the defense as to areas of possible cross-examination and closing argument. Further, prior to closing their case-in-chief, defense counsel renewed the request to call Dr. Draper to the stand. The court denied the request, but accepted Dr. Draper's in-camera testimony as an offer of proof.

> The admission of expert testimony is governed generally by 12 O.S.1991, § 2702. In areas of novel scientific evidence, this Court has adopted the standard set forth in Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). See Taylor v. State, 889 P.2d 319, 328 (Okl.Cr.1995). In Daubert, the Supreme Court stated that such expert testimony is admissible only if it is both relevant and reliable. Daubert, 509 U.S. at 597, 113 S.Ct. at 2799. This inquiry into reliability and relevance is two-fold. The reliability prong requires the expert opinion testimony be about "scientific knowledge". Taylor, 889 P.2d at 329. The relevance prong involves the requirement that the proffered testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Id. at 330.

[Gilson] argues Dr. Draper's testimony "undoubtedly involved 'scientific knowledge'", and that the relevant question here is whether Dr. Draper's testimony would have assisted the trier of fact. While we appreciate [Gilson]'s offer to reduce our work by focusing on only one prong of the Daubert analysis, we find it necessary to review both prongs of the analysis in order to properly evaluate the trial court's ruling and resolve [Gilson]'s allegation of error.

In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 1174, 143 L.Ed.2d 238 (1999), the Supreme Court extended Daubert to testimony based on "technical" and "other specialized" knowledge. The Court stated whether Daubert's specific factors are, or are not, reasonable measures of reliability in a particular case is a matter that the law grants the trial judge broad latitude to determine. 526 U.S. at 152, 119 S.Ct. at 1176.

Reviewing the record under the criteria set forth in Daubert and Kumho we find Dr. Draper's qualifications as an expert do not seem to be in doubt. She testified to having a Ph.D. in Child Development and working and teaching in the field of child development for approximately twenty years. She also stated that during the previous ten years she had participated in a hands-on program which worked directly with abused and neglected children. The trial court seems to have excluded her testimony based upon her theory that the children were not competent to testify, and not upon her lack of qualifications.

Dr. Draper testified generally to factors to be considered in determining whether a child could be a competent witness including capacity and ability to observe, intelligence, memory, ability to communicate. When asked whether "it would be correct to say that failing to properly interview or elicit information from a child can taint or impact their ability to then accurately relate an event?", she answered "[t]hat's a very great possibility, yes." Dr. Draper then addressed the Coffman children specifically. Dr. Draper stated she interviewed each of the Coffman children individually and studied material from the court proceedings and DHS. She gave her conclusion as to whether each of the Coffman children was competent to testify. She generally concluded that based upon the children's life history of trauma, abuse and neglect, and the effect that has on memory and ability to recall, combined with the death of their brother Shane, and the numerous interviews conducted in connection with the court proceedings, none of the Coffman children were competent to testify at trial.

A review of the record shows there was no testimony regarding whether Dr. Draper's theory of the effect of trauma on the child's ability to be a competent witness has been or can be tested. There was no showing of its general acceptance in the field of child development. Further, Dr. Draper testified only as to a "great possibility" that improper interview techniques could impact a child's ability to relate an event. Dr. Draper interviewed each of the children only once, just prior to trial, and asked each of them five or six uniform questions. She testified she had no knowledge of whether the statements the children made concerning the facts of the case were embellished or false. She also stated that piecemeal disclosure of the facts is common among child abuse victims.

Having thoroughly reviewed the record, we find the trial court did not abuse its discretion in excluding the testimony. Dr. Draper's testimony did not meet the Daubert requirements of "scientific knowledge" and the testimony would not have assisted the trier of fact. Once the trial court determined the children were competent witnesses, Dr. Draper's testimony would have been confusing and its speculative nature would not have been relevant to the jury's determination of the credibility of children's testimony. Accordingly, we find the testimony was properly excluded. This assignment of error is denied.

Gilson I, 8 P.3d at 907-08 (internal paragraph numbers omitted).

*c) Gilson's challenge to the OCCA's analysis*

Because the OCCA did not address Gilson's argument that the state trial court's ruling violated his constitutional rights, we must review those arguments de novo. See Young, 486 F.3d at 663 ("If the state court did not decide a claim on the merits, and it is not otherwise procedurally barred, we review the district court's legal conclusions de novo."). In doing so, however, we

may not provide habeas corpus relief on the basis of state court evidentiary rulings unless they rendered the trial so fundamentally unfair that a denial of constitutional rights results. Because a fundamental-fairness analysis is not subject to clearly definable legal elements, when engaged in such an endeavor a federal court must tread gingerly and exercise considerable self-restraint.

78

<u>Duckett v. Mullin</u>, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks and citations omitted).

Despite Gilson's general assertion that his constitutional rights were violated, his supporting arguments focus almost exclusively on the merits of the state trial court's evidentiary ruling. For example, Gilson complains that, contrary to the conclusion reached by the OCCA, "the trial judge based his ruling on Dr. Draper's conclusions, not on her methodology or her scientific knowledge." Aplt. Br. at 101. Gilson argues that "once the judge ruled the children were competent under Oklahoma Evidence Rules 2601 and 2603, the issue was no longer admissibility but the weight the jury should give their testimony," and "Dr. Draper's expertise should have been allowed to assist the jury in that evaluation." <u>Id.</u> In other words, Gilson argues, "the trial judge failed in his gatekeeper role because he did not perform the proper rudimentary tests to assess the admissibility of Dr. Draper's testimony in light of <u>Daubert</u> and its Oklahoma progeny, <u>Taylor v. State</u>, 889 P.2d 319 (Okla. Crim. App. 1995)." <u>Id.</u> at 101-02. Similarly, Gilson argues that "[t]he OCCA perpetuated the trial judge's error by holding Dr. Draper to the outmoded general acceptance standard of <u>Frye v. U.S.</u>, 293 F. 1013 (D.C. Cir. 1923)." <u>Id.</u> at 107. "This," Gilson argues, "is now merely an additional though not exclusive factor in the <u>Daubert</u> analysis . . . ." <u>Id.</u> Gilson also asserts that "[t]he OCCA further erred because it did not apply the proper standard of review to the proposition of error regarding the testimony of Dr. Draper." <u>Id.</u> at 108. More specifically, Gilson argues that because the state trial judge "failed in his gatekeeper role," "the review of this failure should have

been de novo and not for abuse of discretion." Id.

Given the fundamental fairness analysis that applies to this issue, as well as the self-restraint that we are bound to exercise in this setting, we conclude that Gilson's arguments can be easily disposed of without delving into all of their specifics. Although Gilson argues in essence that the state trial court applied Oklahoma's evidentiary rules unfairly, a review of the trial transcript firmly establishes otherwise. As noted, the sole focus of Draper's proposed testimony was the credibility of the Coffman children's trial testimony. Although Draper was formally trained in child development, nothing about her educational or professional background necessarily qualified her to provide expert testimony on an issue normally reserved exclusively for the jury, i.e., witness credibility. Indeed, we have long held the "credibility" of a witness "is generally not an appropriate subject for expert testimony" because, in part, it "encroaches upon the jury's vital and exclusive function to make credibility determinations . . . ." United States v. Adams, 271 F.3d 1236, 1245 (10th Cir. 2001) (internal quotation marks and citations omitted); see United States v. Smith, 156 F.3d 1046, 1053-54 (10th Cir. 1998) (affirming district court's decision to exclude proposed expert testimony on subject of eyewitness identification); cf. United States v. Call, 129 F.3d 1402, 1407 (10th Cir. 1997) ("Although the use of experts to bolster witness credibility is disfavored, no absolute rule prohibits utilizing expert testimony for this purpose."). Moreover, it is important to emphasize that, notwithstanding the state trial court's exclusion of Draper's testimony, Gilson was allowed to extensively cross-examine the Coffman children and to explore any alleged

80

inconsistencies between their trial testimony and their prior sworn testimony. Thus, we conclude the state trial court's ruling was neither unreasonable nor rendered Gilson's trial fundamentally unfair.

In terms of the two Supreme Court cases cited by Gilson, the state trial court's evidentiary ruling did not result in a deprivation of Gilson's right to adequately cross-examine prosecution witnesses (as discussed in Davis)[16], nor did it deprive Gilson of his right to a fair opportunity to defend against the State's accusations (as discussed in Chambers).[17] As noted, Gilson's trial counsel was afforded a full and fair opportunity to cross-examine each of the Coffman children, and in doing so was able to attack their credibility and place that issue before the jury. Further, Gilson's trial counsel vigorously attacked the children's credibility during the first-stage closing arguments. E.g., Tr., Vol. X at 2168 ("These kids know they have to come in here and say as many bad things about Don Gilson to make sure he's convicted."); id. ("Unfortunately, with all those pressures

---

[16] In our view, Davis is simply inapposite. The Supreme Court noted in Davis "that the exposure of a [prosecution] witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination." 415 U.S. at 316-17. Such cross-examination, the Court noted, would be "directed toward revealing possible biases, prejudices, or ulterior motives of the witness as they may relate directly to issues or personalities in the case at hand." Id. at 316. If this right is violated, the Court held, "no amount of showing of want of prejudice would cure it." Id. at 318 (internal quotation marks omitted). It is difficult to see how Davis is relevant to the issue of the state trial court's refusal to allow Draper to testify. Although Draper would have testified as to the credibility of the Coffman children, the state trial court's ruling did not directly impact Gilson's right to cross-examine the Coffman children. Indeed, that cross-examination occurred well before Gilson sought to introduce Dr. Draper's testimony.

[17] Gilson's attempt to equate Draper's proposed testimony with the crucial credibility evidence at issue in Chambers is clearly a stretch and ultimately unpersuasive.

and in light of all the trauma that these kids have been through, that combination renders them unreliable, unbelievable."). We therefore conclude that Gilson is not entitled to federal habeas relief on this claim.

*Trial counsel's failure to present evidence of Gilson's brain damage*

In his final issue, Gilson argues that his trial counsel "were ineffective for failing to investigate and present powerful evidence establishing [his] extensive and permanent brain damage." Aplt. Br. at 110. "This information," Gilson argues, could have been used to challenge [his] mental capacity to commit the crime" and, "[m]ore importantly, . . . should have been used as mitigation and could very well have resulted in a sentence less than death." Id.

In support of these arguments, Gilson asserts that he "was temporarily paralyzed . . . and suffered prolonged unconsciousness" as a result of "an auto accident on March 12, 1993." Id. at 111. According to Gilson, "[t]he impact caused severe head injuries, including multiple, extensive facial and cranial fractures," and resulted "in permanent organic brain damage." Id. In turn, Gilson asserts, citing various expert witnesses, that the "brain damage had repercussions on his personality and behavior." Id. at 112. In particular, Gilson asserts that the brain damage resulted in "severe executive and personality dysfunction," and a "decreased ability to self-regulate behavior or inhibit impulses . . . ." Id. (internal quotation marks omitted). These post-accident changes in behavior, Gilson contends, could have been affirmed by testimony from "[n]umerous family members and acquaintances . . . ." Id. at 113.

*a) Clearly established Supreme Court precedent*

Not surprisingly, Gilson identifies Strickland v. Washington, 466 U.S. 668 (1984), as providing the "clearly established federal law" applicable to his claim of ineffective assistance of trial counsel.  In Strickland, the Supreme Court held that "[a] convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components."  466 U.S. at 687.  "First," the Court noted, "the defendant must show that counsel's performance was deficient."  Id.  "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."  Id.  "Second," the Court noted, "the defendant must show that the deficient performance prejudiced the defense."  Id.  "This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable."  Id.  "Unless a defendant makes both showings," the Court held, "it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable."  Id.

*b) OCCA's rejection of Gilson's claim*

Gilson first raised the issue of ineffective assistance of trial counsel on direct appeal.  The OCCA rejected Gilson's arguments on the merits:

> [Gilson] contends in his thirteenth assignment of error that he was denied a fair trial and reliable sentencing proceeding by the ineffective assistance of counsel.  An analysis of an ineffective assistance of counsel claim begins with the presumption that trial counsel was competent to provide the guiding hand that the accused needed, and therefore the burden is on the accused to demonstrate both a deficient performance and resulting

83

prejudice. Strickland v. Washington, at 466 U.S. at 687, 104 S.Ct. at 2064. See also Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Strickland sets forth the two-part test which must be applied to determine whether a defendant has been denied effective assistance of counsel. First, the defendant must show that counsel's performance was deficient, and second, he must show the deficient performance prejudiced the defense. [footnote omitted]. Unless the defendant makes both showings, "it cannot be said that the conviction ... resulted from a breakdown in the adversary process that renders the result unreliable." Id., 466 U.S. at 687, 104 S.Ct. at 2064. [Gilson] must demonstrate that counsel's representation was unreasonable under prevailing professional norms and that the challenged action could not be considered sound trial strategy. Id., 466 U.S. at 688-89, 104 S.Ct. at 2065. The burden rests with [Gilson] to show that there is a reasonable probability that, but for any unprofessional errors by counsel, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id., 466 U.S. at 698, 104 S.Ct. at 2070. This Court has stated the issue is whether counsel exercised the skill, judgment and diligence of a reasonably competent defense attorney in light of his overall performance. Bryson v. State, 876 P.2d 240, 264 (Okl.Cr. 1994), cert. denied, 513 U.S. 1090, 115 S.Ct. 752, 130 L.Ed.2d 651 (1995).

* * *

Filed with the direct appeal is an Application for Evidentiary Hearing on Sixth Amendment Claim and Motion to Supplement, pursuant to Rule 3.11(B)(3)(b), Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch. 18, App. (1998). [Gilson] asserts in the Application that counsel was ineffective in failing to investigate and utilize available mitigating evidence. Attached to the Application are twelve (12) affidavits. The first two (2) affidavits are from [Gilson]'s trial counsel wherein they state they received boxes of medical records from Saint Anthony's Hospital pertaining to injuries [Gilson] suffered in a 1993 automobile accident. Both counsel state they did not see any reference to a C.A.T. (Computer Axial Tomograph) scan in the records, therefore they made no attempt to locate such. Both counsel also state that during their investigation of the case, they spoke to several people who mentioned drastic personality changes in [Gilson] since the 1993 accident. Counsel also stated that at the time of trial, they did not know the true extent of the physical and/or psychological damage suffered by [Gilson] as a result of the accident. (Exhibits A and B).

The third affidavit is from Michael L. Johns, an investigator in the

84

Capital Direct Appeal Division of the Oklahoma Indigent Defense System. Mr. Johns stated he reviewed the files provided by [Gilson]'s trial counsel and discovered "two Radiological Reports which indicated that two series of C.A.T. scans were taken of [Gilson's] brain and skull. The first series was done on March 15, 1993, and the second series was done on March 22, 1993." Mr. Johns also stated that on May 6, 1999, he personally picked up from Saint Anthony's Hospital copies of all of the C.A.T. scans conducted on [Gilson]. (Exhibit C).

The next three (3) affidavits are from C. Alan Hopewell, Ph.D., Albert V. Messina, M.D., and Jay A. Rosenblum, M.D. Dr. Hopewell stated he conducted a neuropsychological evaluation of [Gilson] on May 24, 1999, at the Oklahoma State Penitentiary. Based upon that testing, Dr. Hopewell concluded [Gilson] suffers from "irreversible organic brain syndrome which is chronic in nature and which [is] classic for this type of damage and which is a direct result of traumatic head injury." (Exhibit D, pg. 18). Dr. Messina stated he evaluated the C.A.T. scans and medical records concerning [Gilson]. He concluded the records indicated extensive brain damage to [Gilson]'s right frontal lobe and right temporal lobe which remains and results from the prior motor vehicle accident on March 12, 1993. (Exhibit E). Dr. Rosenblum stated he evaluated the reports of Drs. Hopewell and Messina, as well as [Gilson]'s medical records. He verified the findings of Drs. Hopewell and Messina and concluded that [Gilson]'s "severe brain damage in the area most affected is compatible with Dr. Hopewell's neuropsychological evaluation. As a result, [Gilson's] prognosis for improvement is very poor and permanent." (Exhibit F).

The remaining six (6) affidavits are from family, friends and co-workers who state that [Gilson] exhibited drastic personality changes after the 1993 automobile accident. [Gilson]'s mother and step-father state that prior to the accident [Gilson] did not act out of the ordinary, and showed attention to his appearance and household. However, after the accident he withdrew, became careless with his appearance, and took on bizarre habits such as eating only certain foods and having an unnatural fear of other food items. (Exhibits G and H.) Friends and co-workers stated [Gilson] often seemed distant and unaware of his surroundings after the accident (Exhibits I, J, K, and L).

[Gilson]'s Application contends the information contained in the affidavits constitute [sic] the "clear and convincing evidence" necessary under Rule 3.11(B)(3)(b)(i) to demonstrate a strong possibility trial counsel was ineffective. Accordingly, [Gilson] urges this Court to so find and to

order an evidentiary hearing to fully address the ineffectiveness issue.

Rule 3.11(B)(3)(6) allows an appellant to request an evidentiary hearing when it is alleged on appeal that trial counsel was ineffective for failing to "utilize available evidence which could have been made available during the course of trial . . . ." Once an application has been properly submitted along with supporting affidavits, this Court reviews the application to see if it contains "sufficient evidence to show this Court by clear and convincing evidence there is a strong possibility trial counsel was ineffective for failing to utilize or identify the complained-of evidence." Rule 3.11(B)(3)(b)(i).

Upon review of the affidavits, we find trial counsel was aware of the automobile accident and any personality changes in [Gilson] since the accident. However, the record reflects that with that knowledge, counsel chose a defense of actual innocence, not one of diminished capacity. That strategic choice is not indicative of deficient performance as a defense of actual innocence was reasonable based upon information provided to counsel by [Gilson]'s family and friends.

> "[A]n attorney who makes a strategic choice to channel his
> investigation into fewer than all plausible lines of defense
> upon which he bases his strategy are reasonable and his
> choices on the basis of those assumptions are reasonable . . .
> ," An attorney's decision not to interview witnesses and to
> rely on other sources of information, if made in the exercise
> of professional judgment, is not ineffective counsel.

Boltz v. State, 806 P.2d 1117, 1126 (Okl.Cr. 1991), cert. denied, 502 U.S. 846, 112 S.Ct. 143, 116 L.Ed.2d 109 (1991), quoting United States v. Glick, 710 F.2d 639, 644 (10th. Cir. 1983).

Here, [Gilson] told police he never abused Shane, but merely assisted in the decision concerning what to do with the body and the removal of the body. Further, he said he never abused any of the other children, that it was Bertha Coffman who abused the children. [Gilson]'s mother and step-father testified they never saw [Gilson] abuse the children and that the children appeared to be fond of [Gilson]. Based upon this evidence, it was a reasonable decision based upon their professional judgment for defense counsel to focus on Bertha Coffman as the actual perpetrator and pursue a defense of actual innocence on [Gilson]'s part. That the strategy proved unsuccessful is not grounds for branding counsel ineffective. Absent a showing of incompetence, [Gilson] is bound by the decisions of his counsel and mistakes in tactic and trial strategy do not provide grounds for subsequent attack. Davis v. State, 759 P.2d 1033, 1036 (Okl.Cr.1988). To

have also raised any type of mental disorder defense would have been inconsistent with a defense of actual innocence and would have considerably weakened both defenses. Counsel's decision in this case was reasonable trial strategy, which we will not second guess on appeal. Bernay v. State, 989 P.2d 998, 1015 (Okl.Cr. 1999).

Further, counsel was not ineffective for failing to present evidence of the injury during second stage. The record shows the second stage defense focused on [Gilson] being a productive and contributing member of society therefore, he deserved a punishment less than death. This included evidence of his lack of any prior violent conduct and his skills and ability to maintain employment. While evidence of [Gilson]'s mental condition and his inability to control his "explosive behavior" may have had some mitigating effect, this evidence could be a two-edged sword. Evidence that [Gilson] had poor control over his behavior had the potential of proving [Gilson] was a threat to society, including prison society, and could indicate a propensity for future violence. Such evidence would have been contradictory to mitigating evidence of [Gilson]'s lack of culpability and lack of violent conduct. Counsel's strategic decision to pursue a second stage defense that [Gilson] was less culpable than Coffman, and highlight the positive traits of his character instead of focusing on any mental problems he might have was well within the range of professional reasonable judgment.

While [Gilson] has provided a great deal of information in his affidavits, we find he has failed to set forth sufficient evidence to warrant an evidentiary hearing. He has failed to show by clear and convincing evidence a strong possibility that defense counsel was ineffective for failing to utilize the complained-of evidence. [citation omitted]. Accordingly, we decline to grant [Gilson]'s application for an evidentiary hearing.

Gilson I, 8 P.3d at 926-29 (internal paragraph numbers omitted).

*c) Gilson's challenge to the OCCA's analysis*

Gilson argues that the OCCA's decision was "flawed" in two related respects.

Aplt. Br. at 116. First, Gilson argues that the OCCA's decision "overlook[ed] the

requirement that counsel conduct a 'thorough' mitigation investigation." Id. (citing

Wiggins v. Smith, 539 U.S. 510, 524 (2003)). Second, Gilson complains that the

87

OCCA's "determination[] as to counsel making a strategic decision [was] based on sheer speculation, which is not enough." Id. In this regard, Gilson argues that the affidavits he submitted to the OCCA from his trial counsel "say nothing of a strategic decision to intentionally omit the evidence," and in fact "suggest there was no strategic decision, as they admit they overlooked the reference to CAT scans and were not aware of the true nature and extent of [his] head injuries." Id. at 117.

We find it unnecessary to address Gilson's arguments, both of which focus on the first Strickland prong, because we conclude, applying a de novo standard of review, that Gilson cannot satisfy the second Strickland prong. Turning first to Gilson's complaint that his trial attorneys failed to present evidence of his auto accident and its effects during the first-stage proceedings, we conclude that Gilson was not prejudiced by this purported failure.[18] Although the OCCA recognized a defense of complete insanity at the time of Gilson's trial, it had never recognized, and appears to this date to have never recognized, a defense to first degree murder positing that the defendant was incapable of forming the specific intent due to a mental illness short of complete insanity. See Grant v. State, 58 P.3d 783, 795 (Okla. Crim. App. 2002) ("We need not reach the issue of a 'diminished capacity' defense in this [first degree murder] case, as Grant's evidence regarding his

_____

[18] We also question whether Gilson adequately presented this argument to the OCCA. Although the "Application for Evidentiary Hearing on Sixth Amendment Claims" that Gilson filed with the OCCA asserted generally that Gilson was denied effective assistance of counsel in both stages of trial, it failed to offer any specific arguments regarding counsel's first-stage performance, and instead focused exclusively on counsel's failure to present evidence of Gilson's auto accident and resulting effects during the second-stage proceedings.

88

mental illness did not show that he suffered mental infirmities that would have rendered him incapable of forming the specific intent necessary."). Moreover, none of the evidence submitted by Gilson to the OCCA in connection with his ineffective assistance claim establishes that he lacked the ability to form the specific intent necessary to be found guilty of first degree murder. To the contrary, the clinical neuropsychologist who examined Gilson (Dr. C. Alan Hopewell) concluded that Gilson had "an overall IQ score of 92," Hopewell Report at 8, and "technically 'kn[e]w right from wrong'" but was "often unable to 'conform his behavior to the right' due to impulsivity, poor judgment, and the failure to see or understand the consequences of his actions." Id. at 10. Thus, the purported failure of Gilson's trial attorneys to pursue a diminished capacity defense to the first degree murder charge, based on Gilson's alleged post-accident changes in behavior, simply did not prejudice Gilson.

We reach a similar conclusion with respect to Gilson's claim that his trial attorneys erred in failing to present accident-related evidence during the second-stage proceedings. With respect to this claim, it is not entirely clear whether the OCCA intended to address the second prong of the Strickland test, but its opinion does contain the following language that is relevant to our second prong analysis:

> While evidence of [Gilson]'s mental condition and his inability to control his "explosive behavior" may have had some mitigating effect, this evidence could be a two-edged sword. Evidence that [Gilson] had poor control over his behavior had the potential of proving [Gilson] was a threat to society, including prison society, and could indicate a propensity for future violence. Such evidence would have been contradictory to mitigating evidence of [Gilson]'s lack of culpability and lack of violent conduct. Counsel's strategic decision to pursue a second stage defense that

89

> [Gilson] was less culpable than Coffman, and highlight the positive traits of his character instead of focusing on any mental problems he might have was well within the range of professional reasonable judgment.

Gilson I, 8 P.3d at 928.

Whether or not we owe any deference to these conclusions, we believe they are entirely accurate. To be sure, the evidence presented by Gilson to the OCCA in connection with his ineffective assistance claim persuasively established that he was involved in a 1993 automobile accident, sustained a serious brain injury as a result of the accident, and has experienced negative physical and mental effects since the accident (e.g., a constant "global" headache; photophobia; increased sensitivity to auditory stimuli). Dr. Hopewell's neuropsychological consulting report, however, paints a bleak and ominous picture of Gilson's personality, behavior, and likely future conduct. For example, Hopewell noted that Gilson had a "tendency to become agitated and belligerent easily when frustrated." Hopewell Report at 12. Indeed, Hopewell reported that this tendency actually played out during their interview, with Gilson becoming frustrated at Hopewell and at times throwing his pencil across the room, yelling, answering in gibberish, and refusing to continue with requested testing. Hopewell opined that Gilson "w[ould] have extreme difficulties in terms of frustration tolerance as well as restrictions in abilities to deal with complicated, stressful, complex, and ambiguous situations." Id. at 8. Relatedly, Hopewell concluded that Gilson would have difficulty conforming his behavior to societal norms "due to impulsivity, poor judgment, and the failure to see or understand the consequences of his actions." Id. at 10. Hopewell also concluded that

90

Gilson had an "inability to regulate behavior or inhibit impulses" and thus "w[ould] often act before thinking." Id. at 18. Given these extremely negative descriptions of Gilson's likely behavior, we conclude that the presentation of this evidence to the jury during the second-stage proceedings would not have resulted in a different outcome. In particular, we conclude that the presentation of this evidence would likely have weighed against Gilson by erasing any lingering doubts that may have existed as to his role in Shane's murder, and by confirming the jury's conclusion that he represented a continuing threat, even if confined in prison for life. Thus, we conclude Gilson was not prejudiced by the failure of his trial attorneys to gather and present this evidence to the jury during the second-stage proceedings.

The judgment of the district court is AFFIRMED.

<u>Gilson v. Sirmons</u>, No. 06-6287

**HENRY**, Chief Judge, dissenting in part.

"This was a horrible crime." *Gilson v. State*, 8 P.3d 883, 930 (Okla. Crim. App. 2000) (Chapel, J., dissenting). It is difficult to imagine a more heart-rending set of facts than those that befell a helpless and innocent Shane Coffman. There is no question that Donald Gilson had a history of abusing at least some of the Coffman children, who lived in fear of him, and I rest assured that he will be punished for that abuse, as he was convicted of two out of five counts of injury to a minor. Further, should the court see fit to adopt the reasoning of this partial dissent, Mr. Gilson would again face trial for murder or manslaughter with a properly instructed jury.

I am aware that we owe state courts great deference under AEDPA. We may only reverse their determinations in the most limited circumstances. Nevertheless, when a death sentence is imposed we must be certain that it was with the full protections of the Constitution.

It was with this in mind that Congress enacted 28 U.S.C. § 2254, providing habeas relief in order "to interpose the federal courts between the States and the people, as guardians of the people's federal rights – to protect the people from unconstitutional action." *Reed v. Ross*, 468 U.S. 1, 10 (1984) (internal quotation marks omitted). This protection is most crucial when the defendant's life hangs in the balance. "[D]eath is a different kind of punishment from any other which may be imposed in this country . . . . It is of vital importance to the defendant and to the community that any decision to

impose the death sentence be, and appear to be, based on reason rather than caprice or emotion." *Gardner v. Florida*, 430 U.S. 349, 357-58 (1977).

The majority opinion is well-written and carefully resolves a number of issues in this prosecution under a relatively new and unique statute. While I agree with much of its resolution of the issues before us, I must part company on one vital issue protected by our legal heritage. In a case with such disturbing facts, filed against a defendant who had at least some history of abuse, the risk of an unwarranted conviction is especially high. "The absence of a lesser included offense instruction increases the risk that the jury will convict . . . simply to avoid setting the defendant free." *Spaziano v. Florida*, 468 U.S. 447, 455 (1984). This "risk cannot be tolerated in a case in which the defendant's life is at stake." *Beck v. Alabama*, 447 U.S. 625, 637 (1980).

Ms. Coffman, whose guilty plea was accepted by the state court, was convicted of first-degree murder and received a sentence of life in prison. The dispositive portion of Mr. Gilson's appeal is only about what role Mr. Gilson played in Shane's murder. When determining the narrow question whether Mr. Gilson was entitled to a jury instruction on second-degree manslaughter, we have only one question before us – what could a reasonable jury have found regarding Mr. Gilson's culpability in Shane's death? Evidence was presented at trial that Mr. Gilson played no part in abusing Shane the day he died and that he was asleep on the couch during the abuse that led to Shane's death. A rational jury could have believed this evidence and found Mr. Gilson guilty of culpable negligence, but not of actively permitting child abuse, as the Oklahoma statute requires

2

for a first-degree murder conviction.  Because, even under our deferential standard of review, the evidence supported giving an instruction on second-degree manslaughter – a right protected under *Beck* and *Spaziano* – I must respectfully dissent.

A.  Standard of Review

First, I must address the appropriate standard of review.  We have never definitively determined whether sufficiency of the evidence to support a lesser included offense instruction is a factual or a legal question.  *See, e.g.*, *Boltz v. Mullin*, 415 F.3d 1215, 1233 (10th Cir. 2005) (noting that the Tenth Circuit has not yet decided the appropriate standard); *Turrentine v. Mullin*, 390 F.3d 1181, 1197 (10th Cir. 2004) (same); *Hogan v. Gibson*, 197 F.3d 1297, 1306 (10th Cir. 1999) (same).  If it is a legal question, we must ask whether it was contrary to or an unreasonable application of clearly established federal law.  28 U.S.C. § 2254(d)(1).  If it is a factual determination, we must ask whether the OCCA's conclusion was "an unreasonable determination of the facts in light of the evidence presented."  28 U.S.C. § 2254(d)(2).  Further, if factual, we must presume the state court's determinations to be correct unless Mr. Gilson has presented clear and convincing evidence to the contrary.  28 U.S.C. § 2254(e)(1).

The Oklahoma Court of Criminal Appeals characterizes the sufficiency of the evidence to support a lesser included offense instruction as a legal issue.  *See e.g.*, *Young v. State*, 12 P.3d 20, 39 (Okla. Crim. App. 2000).  Moreover, in direct criminal appeals, we treat denials of lesser included offense instructions as legal determinations.  *See, e.g.*,

3

*United States v. Castillo*, 140 F.3d 874, 886 (10th Cir. 1998).

Consistent with this approach, the sufficiency of the evidence to support a lesser included offense instruction seems to me not to be a purely factual determination. *See Hogan*, 197 F.3d at 1306 n.6 (stating that although the panel cannot resolve the inconsistency itself, it unanimously agrees that we should treat the determination as a conclusion of law). While such a determination involves some application of the facts, this is not the end of the inquiry, as "[t]his appellate function does not involve fact finding in the first instance, but rather a review of the record to determine whether the factfinder had an evidentiary basis for its rulings which would satisfy the *legal standard* in question." *Bryson v. Ward*, 187 F.3d 1193, 1211 (Briscoe, J., concurring) (emphasis added). In this case, the OCCA did not *find* any facts in determining that Mr. Gilson was not entitled to lesser included offense instructions. Instead, the OCCA applied the clearly established federal legal standard set forth in *Beck*, to the facts in the record.

"No presumption of correctness attaches to legal conclusions or determinations on mixed questions of law and fact." *Case v. Mondragon*, 887 F.2d 1388, 1393 (10th Cir. 1989). Therefore, we must review such legal determinations under § 2254(d)(1), reversing the OCCA only if its determination was an unreasonable application of *Beck*. I maintain that it was.

B. The second-degree manslaughter instruction

Under *Beck*, "a sentence of death [may not] constitutionally be imposed after a jury verdict of guilt on a capital offense, when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, and when the evidence would have supported such a verdict." 447 U.S. at 627 (internal quotation marks omitted). It is the jury's duty to weigh the evidence – not ours, and not the OCCA's. But in order to allow a jury to most freely perform its duties, we must be sure that state courts follow *Beck*'s mandate, which was designed "to eliminate the distortion of the factfinding process that is created when the jury is forced into an all-or-nothing choice between capital murder and innocence." *See Spaziano*, 468 U.S. at 455. *Beck*'s mandate applies even when the convicting jury retained the discretion not to sentence the defendant to death. *Hooks v. Ward*, 184 F.3d 1206, 1227 (10th Cir. 1999). Here, the evidence supported instructions for culpable negligence second-degree manslaughter under Okla. Stat. Ann. tit. 21, § 716.

**1. Second-degree manslaughter defined**

"Every killing of one human being by the act, procurement, or culpable negligence of another . . . is manslaughter in the second degree." OKLA. STAT. ANN. tit. 21, § 716. Oklahoma defines culpable negligence as "the omission to do something which a reasonably careful person would do, or the lack of the usual ordinary care and caution in the performance of an act usually and ordinarily exercised by a person under similar circumstances and conditions." *Oklahoma Uniform Jury Instructions – Criminal* 4-104

5

(2007). Mr. Gilson argues that he fell asleep on the couch while Shane was alone with Ms. Coffman, but did not actively permit Shane's abuse, as the first-degree murder statute requires. "To permit" as used in Oklahoma's child-abuse murder statute means "to authorize or allow for the care of a child by an individual when the person authorizing or allowing such care knows or reasonably should know that the child will be placed at risk of abuse . . . ." OKLA. STAT. ANN. tit. 10, § 7115. As the State argued in its brief before us, "[t]h[e] definition [of 'to permit'] does not encompass a mere failure to act . . . but instead anticipates one's *affirmative action* . . . ." Aple's Br. at 42 (emphasis added).

"Permitting" under the first-degree child abuse murder statute requires active authorization. A "mere failure to act," that does not involve the affirmative action necessary to support a first-degree murder child abuse conviction may constitute culpable negligence. Oklahoma courts have found a defendant guilty of such a culpably negligent failure to act, when, for instance, he failed to seek medical care for a sick child. *Funkhouser v. State*, 763 P.2d 695 (Okla. Crim. App. 1988).[1] The "kaleidoscopic nature of the varying degrees of mental culpability," *People v. Green*, 437 N.E.2d 1146, 1149 (N.Y. 1982), makes the line between active permission necessary for first-degree murder and a culpably negligent failure to act hard to draw. Determining a given defendant's degree of culpability, however hard to define, is "to be inferred from the facts and

---

[1]Notably, in a subsequent case, the OCCA did comply with *Beck* and held that where the defendant spilled boiling water on his son to the point that he died as a result of his burns (and this tragedy took place in the bedroom, not the kitchen), the defendant was entitled to culpable negligence second-degree manslaughter instructions. *Ball v. State*, 173 P.3d 81 (Okla. Crim. App. 2007).

6

circumstances proved and involve[s] fine gradations along but a single spectrum of culpability." *Id.* (internal quotation marks omitted). The question for us is whether a rational jury could have found that Mr. Gilson engaged in some failure to act that falls short of the necessary active authorization required to meet Oklahoma's definition of "permit" but is still actionable as culpable negligence.

## 2. The evidence

"[I]t has long been beyond dispute that the defendant is entitled to an instruction on a lesser included offense if the evidence would permit a jury rationally to find him guilty of the lesser offense and acquit him of the greater." *Beck*, 447 U.S. at 635 (internal quotation marks omitted). After considering all of the State's evidence, I believe there remains a set of facts that a rational jury could have relied on to convict Mr. Gilson of second-degree manslaughter and acquit him of first-degree murder. Although, as the majority notes, Ms. Coffman's testimony and police interviews contained some inconsistencies as to exactly what happened that night, Ms. Coffman consistently claimed that Mr. Gilson had not abused Shane on the day of or the few days preceding Shane's death.[2] Whatever inconsistencies plagued Ms. Coffman's testimony as to her own

---

[2] *See, e.g.*, Trial Transcript, vol. VI, at 1403-04, 1375 (Ms. Coffman stating that, as she said in the February 9 interview with police, Don Gilson did not touch Shane on the day he died and that Mr. Gilson hadn't done anything else to discipline Shane that day). *See also* Add. Aplt's Br., at 145, 154, 180 (Oklahoma State Bureau of Investigation Interview Transcript) (stating "[I]t was about two days before [Shane died] that he had spanked Shane," "Nobody touched that boy [Shane] but me that day. Nobody," and, "I have gone over this, and over this, and over this and for six, for almost six months. But believe me, I lived this day every day of my life since then. And I don't remember him

(continued...)

7

actions, and whatever she stated about Mr. Gilson's temper in general, she was consistent as to this one, critical point.

A rational jury, believing Ms. Coffman's testimony along with, for instance, Mr. Gilson's claims that he was asleep on the couch during the abuse leading to Shane's death, could have found that Mr. Gilson was culpably negligent and therefore guilty of second-degree manslaughter. The culpably negligent action in this scenario would have been falling asleep on the couch while Ms. Coffman, to his knowledge, disciplined Shane. In the closing arguments during the guilt phase of the trial, Mr. Gilson's counsel said, "He thought that Bertha was just spanking [Shane]; that she had Shane in timeout; that he was in the bathtub; that he was not being cooperative. Nowhere in [Mr. Gilson]'s statement is there anything about him being aware of [Ms. Coffman] beating on Shane, hitting him with a board, hitting him in the legs, hitting him in the arms, hitting him in the head, nowhere." Trial Transcript, vol. X, at 2202-03. Mr. Gilson's counsel further pointed to the report of the state's investigator, Cliff Winkler, which noted that Mr. Gilson's testimony was consistent with Ms. Coffman's as to the fact that he was asleep when she came in and reported that Shane was not breathing and that he then performed CPR for an hour and a half. *Id.* "[Mr. Gilson] said he was in shock. He said he had no conceivable idea what had happened." *Id.*

A rational jury could believe this set of facts and find that Mr. Gilson did not

---

[2](...continued)
ever spanking Shane that day.").

8

actively permit Ms. Coffman's abuse that killed Shane, but instead negligently failed to intervene, falling asleep while she was alone with him. A rational jury could have found that this failure to act, while tragic, did not rise to the level of affirmatively, actively, wilfully permitting Ms. Coffman to abuse Shane – that is, that along the spectrum of culpability, Mr. Gilson's failure to act was culpably negligent.

The majority states that Ms. Coffman's testimony's "internal inconsistencies" and "the overwhelming weight of the State's evidence" establish that no rational juror could convict Mr. Gilson of manslaughter while acquitting him of first-degree murder. Maj. Op. at 69-70. The majority is certainly right that the State presented abundant evidence to support Mr. Gilson's first-degree murder conviction – but, respectfully, this is not the question:

> A *Beck* claim is not the functional equivalent of a challenge to the sufficiency of the evidence for conviction; rather, *Beck focuses on the constitutionality of the procedures employed in the conviction of a defendant in a capital trial* and is specifically concerned with the enhanced risk of an unwarranted capital conviction where the defendant's life is at stake and a reasonable jury could have convicted on a lesser included offense.

*Hogan*, 197 F.3d at 1305 (emphasis added).

As the State itself noted in its closing argument during the guilt phase of the trial, Ms. Coffman has consistently claimed that she and she alone is responsible for Shane's death. Trial Transcript, vol. X, at 2161. The State further argued that the jury should not believe Ms. Coffman's version of events because "[t]here is a bond between those two, Bertha Jean and Donald Lee," *id.* at 2162, and that "[Ms. Coffman] thinks she's got the

9

death penalty beat and she is going to try her damnedest to give him the same gift out of you. . . . From her jail cell Bertha Jean is still trying to run things, and she will if you let her." *Id.* at 2163. While it is certainly possible Ms. Coffman may have been covering up for Mr. Gilson, the State's mere intimations regarding Ms. Coffman's motivation is not enough to render Ms. Coffman's testimony unbelievable by *any rational jury*.

### 3. Application of *Beck*

It is neither our job, nor the OCCA's to weigh the evidence and decide which side's is stronger. "Our question is not whether the evidence pointing to the lesser offense . . . was weak." *United States v. Humphrey*, 208 F.3d 1190, 1207 (10th Cir. 2000). Instead, we must ask whether "there is any evidence fairly tending to bear upon the lesser included offense, *however weak that evidence may be*." *Id.* A trial court may properly deny a defendant's request for a lesser included offense instruction only when there is *no evidence* to reasonably support that conviction. *See, e.g.*, *Young v. Sirmons*, 486 F.3d 655, 672 (10th Cir. 2007) (defendant not entitled to a lesser included second-degree murder instruction when "forensic evidence revealed that there were at least three weapons used during the gunfight, and there was *no evidence* of shots fired by anyone but [the defendant and two others]") (emphasis added), *cert denied*, 128 S.Ct. 1269, (2008); *Darks v. Mullin*, 327 F.3d 1001, 1010 (10th Cir. 2003) (defendant not entitled to a lesser included first-degree manslaughter instruction when "[his] attorney was forced to concede at oral argument, that *no evidence* support[ed] the adequate provocation element") (emphasis added).

10

Here, the State did present ample evidence that Mr. Gilson's treatment of the Coffman children was, at times, nothing short of atrocious. Nevertheless, in conducting our lesser included offense inquiry, we must only concern ourselves with the events that caused Shane's death. The evidence of prior abuse on which the State relied to support the capital murder charge is not evidence that Mr. Gilson *necessarily* caused or wilfully permitted Shane's death. Although the State's case was strong, the State's presentation of the facts was not the only reasonable interpretation of the evidence, and the jury did not have to believe it (and in fact did not believe the evidence in three of the five counts of injury to a minor). We already know that the jury was split as to whether Mr. Gilson actively permitted the abuse or committed it himself. Especially in light of Ms. Coffman's unequivocal testimony that Mr. Gilson played no part in abusing Shane the day he died, and the testimony of both that Mr. Gilson was asleep on the couch, it is not the case that there was *no* evidence to support an instruction on second-degree manslaughter.

*Beck* and its progeny are meant to ensure that no jury in a capital case is faced with an all-or-nothing decision when the evidence supports a third option. In this case, the evidence did just that. Because "permitting" child abuse requires affirmative action, a rational juror could have found that Mr. Gilson guilty of the culpable negligence of second-degree manslaughter, without finding that his failure to act rose to the level of affirmative action required to prove first-degree murder beyond a reasonable doubt. However, the jury was still faced with an all-or-nothing decision. Because, in my view,

11

the OCCA's determination was an unreasonable application of *Beck* and Mr. Gilson was entitled to a second-degree manslaughter instruction, I must dissent.